**AMALGAMATED CLOTHING WORKERS OF AMERICA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HAMBURG SHIRT CORPORATION, Respondent.**

**Nos. 19897, 19940.**

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 22, 1966.

Decided Dec. 15, 1966.

Mr. Robert J. Rabin, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Jacob Sheinkman, New York City, was on the brief, for petitioner in No. 19897.

Mr. Peter Ames Eveleth, Atty., N. L. R. B., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Gary Green, Atty., N. L. R. B., were on the brief, for petitioner in No. 19940 and respondent in No. 19897.

Mr. Thurman Arnold, Washington, D. C., for respondent in No. 19940. Mr. Dennis G. Lyons, Washington, D. C., was on the brief for respondent in No. 19940.

Before BURGER, McGOWAN and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge.

The businessmen of the hamlet of Hamburg, Arkansas, (population 3000), eager to attract industry to their town, formed the Hamburg Industrial Development Corporation, and succeeded in inducing a major shirt manufacturing company to locate its new factory in Hamburg. The local chamber of commerce and the development corporation conducted labor surveys and arranged for testing some women residents on their ability to operate sewing machines. The local businessmen indorsed notes covering the cost of refurbishing the training building and covering the training period. Bonds totaling $300,000, secured by an increase in county real estate taxes, were issued to construct a plant for the factory. The cautious manufacturer created an independent subsidiary corporation for the Hamburg operation and included in the lease a term permitting the company to reject the plant if it found the specifications inadequate.

Not long thereafter, the Amalgamated Clothing Workers of America, AFL-CIO ("Union"), petitioner in No. 19897, commenced an organizing campaign among the employees of the fledgling Hamburg Shirt Corporation ("Company"), respondent in No. 19940. A number of workers signed union authorization cards, but the Company refused a request for recognition, and instead insisted on an election under the auspices of the National Labor Relations Board. As actively as the union solicited the employees for support, various civic leaders and some officials of the company advised the employees that it would be unwise or unnecessary for the Union to be brought to Hamburg. The findings of the Board concerning the Company's participation and responsibility are assailed on this appeal.

The Union lost the first representation election, but the Board's regional director set it aside on the ground that the interaction of the opposition campaigns of the local businessmen and plant officials had exceeded permissible bounds. While this ruling was pending before the Board, the Company engaged in other activities that the Union has complained of, namely allegedly unlawful intimidation of employees by surveillance of Union meetings and the discharge of

several workers because of their union organizing. After a hearing, the Board agreed that the Company had violated Section 8(a) (1) of the National Labor Relations Act,[1] by announcing promises of benefit to discourage employee interest in the Union and by coercively interrogating them about their union activity while preparing for the Board's hearing. The Board also held the conduct of the business leaders imputable to the Company and made this a part of the basis for its finding of a Section 8(a) (1) violation. Further, the Board also found a violation of Section 8(a) (3), concluding that the discharges had been made because of union activity and not because of inefficiency or insubordination as the Company defended, and ordered reinstatement with back pay. On the refusal to recognize the claim to majority status, the Board held the Company's action reflected a desire to gain time to undermine the Union, and not a good faith doubt about the clarity of the union authorization cards signed by the employees. The Board accordingly found this a breach of Sections 8(a) (5) and (1). However, the Board declined to find unlawful surveillance of organizational meetings, and failed to grant affirmative relief as broad as the Union claims is appropriate if the consequences of the anti-union refrains are to be silenced.

Finding all of the Board's conclusions supportable by substantial evidence in the record as a whole, and convinced that in determining the Company's responsibility it could properly take into account the conduct of the business community, we enforce the order against the Company, affirm the refusal to find unlawful surveillance, and hold the relief granted to the Union sufficient, within the Board's discretion, to effectuate the policy of the National Labor Relations Act.

1. We turn first to the Board's decision to impute the anti-union conduct of the local business community to the Company, and to view the questionable activities of Company officials against this backdrop. Of significance in this regard was the intimate connection between community and Company. As already stated, the community leaders had taken the initiative in securing the Company's location in Hamburg. They had subsidized the labor surveys and advanced funds for construction of the facilities—on which the Company had a right of refusal. Although the direct financial stake moved from the businessmen to the town when the bond issue was passed and the development corporation reimbursed out of the proceeds, the early financial outlay by the businessmen obviously foreshadowed and signaled a more enduring business interest.

The general interest of the business leaders in industrialization profitable to the community was heightened by an earnest concern that success reward the enterprise of the "test case," i. e., Hamburg Shirt Corporation. In short, any threat to the economic welfare of the Company had more than merely detached interest for the town elders; they fully appreciated that injury to the Company's viability threatened the symbiotic relationship of town and company.

Moreover, the businessmen who had succeeded in bringing the Company to Hamburg were not thereafter passive spectators; they continued with a role that involved them directly in the factory's affairs. Employees with grievances with the Company turned to the community businessmen for help, and helpful they frequently were. They also freely recommended prospective employees to the management, and often these candidates were hired. They spoke to employees about shortcomings, in the eyes of management, in regard to both output and quality of work done. In speaking of plant activities to the employees they reflected an identity of interest and involvement with the Company, and their sentiments were well known to management. In a key instance the businessman who served as

---

1.  61 Stat. 140 (1947), as amended, 29 U.S.C. § 158(a) (1) (1964).

master of ceremonies at a Company open house spoke to the assembled employees that "we had planned to expand" and expansion was still a possibility "if we don't have any more trouble." The Company official who spoke at this event did not deny or qualify these remarks, and on a later day he stated that if the Union were successful "no one will ever know about the expansion plans or other plans."

■ In this setting responsibility under the Act is not controlled by refinements of the law of agency. The Company's silence may properly be taken by the Board as recognition or ratification of the role of those not formally included in the corporate organization chart. We emphasize also the familiarity of the community leaders with the Company's detailed production quotas and figures, which suffused their conversations with the employees, and their visits to the plant on many occasions to confer with Company officials. In such a context it was not at all unreasonable for the Board to approach the case as one where the Company may be held accountable for lack of disavowal of the businessmen's campaign in view of the employees' reasonable and predictable conclusion that the business leaders in inveighing against the Union were serving in effect as organs of communication from management.

■ In a case presenting many of the same issues raised here, and in particular that of the relationship of the anti-union activities of businessmen in a small town to an employer's refusal to recognize a union, the Eighth Circuit recently held their conduct attributable to the company. See Colson Corp. v. NLRB, 347 F.2d 128, 137 (8th Cir.), cert. denied, 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed. 2d 157 (1965). In this type of case, vicarious liability does not depend on

rigid application of principles of *respondeat superior.*[2]

Clasped together under the stimulus of small town economics, the Company and the community were linked in a kind of joint venture, rooted in an overlap of financial interest. In this context the Company's silence is expressive. The Company made no effort to dissipate the impression that the local entrepreneurs spoke with its authority, nor did the Company repudiate their grim forebodings of the consequence of Union victory. When the Company treasurer was directly asked by employees whether unionization would close down the plant he generally answered in the negative, though in at least one instance, according to testimony credited by the Board, he was evasive. But this cannot outweigh the failure to repudiate the explicit observations of civic leaders so closely involved with the Company.

We are not confronted with a problem of unconscious parallelism of behavior. This is a case of multiple fibers intertwined in a single strand. In this context, the Board could permissibly impute the conduct of the businessmen to the Company, particularly where as here the Company's responsibility was not predicated solely on the conduct of the businessmen, but that conduct was a backdrop against which the Board viewed the Company's otherwise marginal promises of benefit and portents of reprisal in finding a bad faith endeavor to avoid recognizing the Union until its status could be undermined. In short, it was not arbitrary for the Board to conclude that the Company took advantage of its employees' impression that the community leaders spoke for the Company in driving home the implications of the comments made more gingerly by Company officials.

■■ 2. The Company defended its refusal to recognize the Union on the

**2.** Congress has established the policy that in labor relations, in "determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 61 Stat. 137 (1947), 29 U.S.C. § 152(13) (1964).

ground that it believed that enough of the employees who had signed the authorization cards were either misinformed or misled about the nature of the documents they subscribed so that the Union in fact did not have majority status. Union authorization cards suffice to establish the requirement of union designation unless the employer can sustain the burden of showing that the card is inherently misleading or that attendant misrepresentations demonstrate that they should not be taken to mean what they purport to say.[3] The cards here were plain, simple and unambiguous.[4]

■■ Much time at the hearing was spent examining the employees to determine whether they had been told that the "only" purpose to be achieved by signing the cards was the opportunity to have a certification election. The Examiner concluded that a majority, albeit a bare majority, knew that the cards designated the Union as their bargaining agent, and thus concluded that it had majority status when the Company refused to bargain. In challenging this finding, the Company directs us to places in the record at which witnesses said they were "only told" that the purpose of the cards, or that "the only purpose," was to gain an election. The record is more murky than the Company suggests. For instance, when asked by Company counsel what she had

been told about the card, employee Frisby responded that "It was to see how many were interested in getting a union in the factory." When counsel inquired whether "you were told that was the only purpose of it?" she answered "Yes, sir." (R. 356). On cross-examination the witness testified that the only reason given by the organizer was to see how many were interested in a union. Then Board counsel asked—"She did not say the only reason for signing the card is to get an election, did she?" Frisby replied "No, sir." (R. 357). Where an employee has signed a card which plainly designates a union as bargaining agent, the employer can prevail only with clear evidence of misrepresentation. A morass of hazy individual recollections of attendant circumstances will not suffice. In our view the Board was justified in concluding that the Company's proof did not suffice to undercut the Union's authorization cards.

■ 3. On the issue of the discharges, we find evidence in the record which, while hardly overwhelming, may fairly be interpreted to show anti-union hostility as motivating the decision to reduce the work force and the choice of who was to be expended. Our function in reviewing the findings of an administrative agency is limited and we see no basis for reversal.

3. Amalgamated Clothing Workers of America [Sagamore Shirt Co.] v. NLRB, 124 U.S.App.D.C. 365, 365 F.2d 898, 906–908 (1966). See generally Comment, *Union Authorization Cards*, 75 YALE L.J. 805 (1966).

4. The card read:
APPLICATION FOR MEMBERSHIP
in the
Amalgamated Clothing Workers of America
209½ W. SECOND    FRanklin 4–6750
LITTLE ROCK, ARK.
I, the undersigned, hereby apply for membership in the Amalgamated Clothing Workers of America, and do hereby appoint and authorize the officers thereof, to represent and negotiate for me in all matters pertaining to wages,

hours and other conditions of employment.
Name (Please sign): ..............
Address: ........................
Telephone No. ..........Date: ......
Company: ........................
Department: .........Operation: ....
          Sign: ....................
This card does not even have the fine print indicating an alternative use of the card in gaining an election, as did the card we recently held clear enough to be immune from individual impeachment because of subjective understanding, in International Union, UAW [Aero Corporation] v. NLRB, 124 U.S.App.D.C. 215, 363 F.2d 702, 705, cert. denied, Aero Corp. v. N. L. R. B., 385 U.S. 973, 87 S. Ct. 510, 17 L.Ed.2d 436 (U.S. Dec. 6, 1966).

4. We likewise find substantial evidence to support the Board's conclusions, challenged by the Union, that the presence of Company officials close by the sites of Union organizing meetings on two occasions did not suffice to establish illegal coercion by surveillance. The Board was entitled to weigh the evidence in the light of Hamburg's small-town character. Indeed, one of the alleged violations took place when the plant manager and his wife dined in the same restaurant in which the employees were convened to discuss the Union. The Company's explanation that this was mere coincidence seems the more plausible since Hamburg has but one restaurant.

The Union also contends that the Board erred in not granting broader relief for those unfair labor practices that it did find. Specifically, the Union suggests that the Board erred in failing to issue an order that would visit a monetary loss upon the Company (*e. g.* through a bond of $100,000 to be forfeited to the United States) if the Company defaults in abiding by the order; that would require the Company to inform its officials they will be summarily discharged if they interfere with Union activity; that would require the Company to permit the Union to hold weekly meetings on Company time until a contract is negotiated; and that would direct the Company to write to all business leaders and the local newspaper openly disavowing their anti-union sentiments, conspicuously posting and mailing to all employees copies of such letters. The Board's power to fashion remedies places a premium upon agency expertise and experience, and the broad discretion involved is for the agency and not the court to exercise.[5] We cannot insist that the traditional relief provided here will be so ineffective to enforce the policies of the Act as to be insufficient as a matter of law.

In No. 19940, the Board's petition for enforcement is granted, and in No. 19897 the Union's petition to review is denied.

It is so ordered.

5. Consolo v. FMC, 383 U.S. 607, 621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 346–347, 73 S.Ct. 287, 97 L.Ed. 377 (1953); International Bhd. of Operative Potters v. NLRB, 116 U.S.App.D.C. 35, 38–39, 320 F.2d 757, 760–761 (1963).