AMALGAMATED CLOTHING WORK-
ERS OF AMERICA, AFL–CIO,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,
Block-Southland Sportswear, Inc., South-
land Manufacturing Company, Inc.,
Intervenors.

BLOCK-SOUTHLAND SPORTSWEAR,
INC., Southland Manufacturing Com-
pany, Inc., Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 21797, 22090.

United States Court of Appeals
District of Columbia Circuit.

Argued May 6, 1969.

Decided June 20, 1969.

Mr. Robert T. Snyder, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Jacob Sheinkman, New York City, was on the brief, for petitioner in No. 21,797.

Mr. Brown Hill Boswell, Charlotte, N. C., of the bar of the Supreme Court of North Carolina, pro hac vice, by special leave of court, with whom Mr. J. W. Alexander, Jr., Charlotte, N. C., was on the brief, for intervenors in No. 21,797 and petitioners in No. 22,090.

Mr. Mitchell L. Strickler, Attorney, National Labor Relations Board, with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Mrs. Nancy M. Sherman, Attorney, National Labor Relations Board, were on the brief, for respondent.

Before BURGER,* LEVENTHAL and ROBINSON, Circuit Judges.

PER CURIAM:

This case brings before us an order of the National Labor Relations Board on petitions to review filed by Amalgamated Clothing Workers of America, AFL-CIO (Union), and by Block-Southerland Sportswear, Inc. and Southerland Manufacturing Company, Inc. (Employer), and a Board cross-application for enforcement.[1] We deny both petitions for review and grant the Board's application for enforcement.

In mid-October of 1965, the Union began its organizational campaign of the Employer's two plants in Wilmington, North Carolina. By letter of November 3, 1965, received November 17, 1965, the Union advised the Employer that it had been designated by a majority of the production and maintenance employees as their bargaining representative, and offered to prove its majority status by giving signed union cards to a neutral third party to be checked. The Employer replied in a November 22, letter with doubts as to the appropriate unit and as to the majority status.

The Union, after sending its original letter requesting recognition, filed a representation petition with the NLRB on November 5. Following a concerted anti-union campaign by the Employer, the Union lost the December 22, election. The Union filed objections to the election and charged that numerous illegal acts of the Employer prior to the election had interfered with the employees' free choice in the election. The Regional Director chose to issue a complaint.

The Regional Director had also issued a complaint concerning numerous alleged unfair labor practices, and he consolidated the representation case with these unfair labor practice cases for examination. The Trial Examiner found that the bargaining unit was appropriate, that the Union had a majority status on both November 4 and 17, and had been exclusive bargaining representative of all the employees since November 4, 1965. He found that the Employer violated § 8(a) (5) of the National Labor Relations Act[2] on and after November 17, 1965, when it refused to bargain collectively with the Union. He also found that the Employer violated § 8(a) (1) of the Act in numerous acts that restrained and coerced the employees in the exercise of their § 7 rights. Finally, the Trial Examiner found that the Employer violated § 8(a) (1), (3), (4) through various acts of discrimination against employees in regard to hire, tenure, and terms and conditions of employment, including among others, discriminatory discharges, layoffs, and transfers. He found that as to certain other discharges that might have been discriminatory the Employer did not violate the Act.

The Board adopted the Trial Examiner's findings for the most part. It departed from the Examiner in its finding in addition that a "serious harm" statement in a speech violated the Act, and that four employees had been constructively discharged discriminatorily, and were entitled to relief.

---

* Circuit Judge Burger did not participate in the disposition of this case.

1. This Employer's petition was transferred from the Fourth Circuit. Block-Southerland Sportswear, Inc. is a purchasing and shipping company which buys shirts from the Southerland Manufacturing Company, Inc. The Trial Examiner noted that the Director of Election in his December 3, 1965 decision found that the two companies were a single employer because they were: (1) functionally interrelated; (2) contiguously located; and (3) commonly owned, controlled and directed by three members of the Block family who set the labor policies. Neither corporation sought Board review of this decision. They now raise the issue of inappropriate bargaining unit, but we find no merit in this claim. They will be treated as one employer throughout this opinion.

2. 29 U.S.C. § 141 *et seq.* (1964).

The Employer on appeal asserts that the Board exceeded its authority in fixing the bargaining unit and in setting aside the election. The Employer also questions the substantiality of the evidence on the record as a whole with respect to the charges of restraint and coercion, the supervisory status of certain personnel, the existence of an uncoerced majority status, the absence of a good-faith doubt and refusal to bargain, and finally the discriminatory discharges, layoffs, and transfers. The Union on appeal claims the Board erred in failing to find additional violations in certain threats and discriminatory discharges, and in failing to extend its relief so as to grant compensatory damages and further means of communicating the remedy to the employees.

Looking at the record as a whole, we find substantial evidence to support the findings of the NLRB.[3] We further rule that the Board neither exceeded its authority nor abused its discretion in its rulings.

### 1. THE CHARGES OF EMPLOYER COERCION.

a. *The "Serious Harm" Statement*: The Employer's president made a speech to the employees and later posted bulletins and mailed notices to each employee of its determination to oppose the Union in every proper way. The president stated that the Union's organization was a matter of concern to the Employer and that:

> It is also, however, a matter of serious concern to you and our sincere belief is that if the Union were to get in here, it would not work to your benefit but, in the long run, would itself operate to your serious harm.

Though the Trial Examiner found numerous unfair labor practices committed by the Employer subsequent to this statement, she felt that the statement was "ambiguous in nature" and not an unfair labor practice. The Board concluded that "considering its total context, we find that the 'serious harm' statement was coercive within the meaning of Section 8(a) (1) of the Act."

The language used by the Employer was considered in Amalgamated Clothing Workers of America [Sagamore Shirt Co.] v. NLRB, 124 U.S.App. D.C. 365, 376–377, 365 F.2d 898, 909–910 (1966), not "in and of itself * * * a 'threat of reprisal or force'" absent extrinsic or accompanying circumstances. But we noted:

> The notice may take a different coloration by virtue of the accompanying circumstances. *Cf.* Holmes, J., in Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918). But the noncoercive character of the notice taken by itself precludes its prohibition unless the Board, endowed with the lens of an expert, provides explanatory findings revealing that the words take on a darker hue when viewed in the perspective of the particular setting.

In the instant case, however, and in its particular setting, the Board did conclude the words take on a darker hue of threat of reprisal. The Board stressed that this was "not merely an isolated opinion unrelated in either context or application to Respondent's subsequent unlawful conduct." Rather it was in a setting of threats of plant closing, job loss, benefit losses, and coercive interrogation making up over 30 separate instances of coercive anti-union activity which the Board noted. This context "emphasize[d] its meaning of 'serious harm' * * * to make certain that the coercive effect thereof was not lost on its employees." Thus, unlike *Sagamore Shirt,* where we felt the notice alone was improperly condemned by reference to mere precedents, here the Board has made an assessment of the particular facts in drawing its conclusions. The drawing of inferences from the facts is for the Board, and our function is not to determine whether the inference of the Trial Examiner or the Board was supe-

3. *Universal Camera Corp.* v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

rior in this matter, but merely whether the Board's action was arbitrary and lacked support in the record. Amalgamated Clothing Workers of America [Hortex Mfg. Co.] v. NLRB, 120 U.S. App.D.C. 47, 50, 343 F.2d 329, 332 (1965); Oil, Chemical, & Atomic Workers Local 4-243 [Allied Chemical Corp.] v. NLRB, 124 U.S.App.D.C. 113, 362 F.2d 943 (1966). Here the Board has pointed to support in the specifics of this record, and we cannot say its conclusions were unreasonable or an abuse of discretion or authority.

b. *Supervisory Status of Lower Echelon Personnel*: The Employer seeks to disclaim responsibility for the coercive interrogations and threatening remarks of certain personnel which the Board charged to the Employer. The Employer claims they are not supervisors within § 152(11) of the Act.[4]

■ To be a supervisor the person must "possess real power 'in the interest of the employer.'"[5] The term has been held not to extend to a mere "straw boss" or "leadman" who directed the performance of routine jobs and merely acted as a conduit of the management's orders.[6] In determining this often difficult issue "the Board necessarily has a large measure of informed discretion."[7]

■ The Employer points out that various of the powers enumerated in the Act were not exercised by the individuals in question. But to be a supervisor, one need not perform each and all of the powers enumerated in the Act. It suffices, to sustain the Board's determination that they are "supervisors," that there is sub-

stantial evidence that the individuals were in a position "responsibly to direct" other employees, not merely in a "routine or clerical nature," but in situations that could at times require the "use of independent judgment."

■ c. *Coercive Interrogations and Threatening Remarks*: The Board has found an interrelated web of coercive statements and interrogations, from the top of the management structure down through lower echelons found "supervisory," with one activity possibly being part of the background or setting for the coercive effect of another. We are not called upon to state in detail whether we would agree or disagree with each of the findings were we assigned the task of drawing inferences from the evidence. We find substantial evidence in the totality of the circumstances surrounding the organization campaign and election to support the determinations by the Board.

■ d. *Attempts to Induce Employees Not to Honor Board Subpoenas*: The Employer contends that the Examiner improperly "found" that it had engaged in attempts to induce employees not to testify. The Employer alleged it disclaimed any interest in the employees' actions, that they were to choose by their own desires and wishes. Evidence does show that on several occasions supervisors did inform employees, knowing they were under subpoena, that they did not need to testify at the hearing unless they "want to go," and that "nobody could make them go." This advice generally was not solicited by the employees. This is a false statement of the law applicable

---

4. 29 U.S.C. § 152(11) (1964): The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

5. International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America [Gulf Bottlers, Inc.] v. NLRB, 111 U.S.App.D.C. 383, 389, 298 F.2d 297, 303 (1961), cert. denied, Gulf Bottlers, Inc. v. NLRB, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962).

6. Keener Rubber, Inc. v. NLRB, 326 F. 2d 968, 969 (6th Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1337, 12 L.Ed.2d 297 (1964).

7. Keener Rubber, Inc. v. NLRB, *supra* note 6 at 970.

to employees subpoenaed in Board proceedings, and that such statements provide substantial evidence to support a finding that the Employer was obstructing the Board's conduct of·the trial and trying to deprive the employees of their statutory rights violating § 8(a) (1).[8]

## 2. THE DISCRIMINATORY DISCHARGES, LAYOFFS AND TRANSFERS.

■ Taking into account the limited power and duty of the court in reviewing Board decisions, we find that the Board had demonstrated substantial evidence to support its findings and conclusions of the various discharges, layoffs and transfers determined to be discriminatory and in violation of § 8(a) (1), (3) and (4).

The Examiner dismissed § 8(a) (3) charges as to 10 discharged employees. The Board differed on the nature of four job terminations which the Board found to be constructive discharges. The Board had more than adequate evidence to support its inference. In the complex of anti-union activity undertaken by the Employer the record is replete with evidence supporting findings of discrimination in various acts involved. There is no indication of arbitrariness. The various findings and determinations of the Board, of violation as to some instances and not as to others, are sustained.

## 3. THE CARD COUNT AND REFUSAL TO BARGAIN.

The above discussion supports the Board's action in setting aside the representation election. We turn now to the refusal to bargain charge that grew out of the Employer's rejection of the offer to bargain that accompanied the assertion of majority status achieved through solicitation of authorization cards. We uphold the Board's bargaining order, in the light of the facts of this case and doctrine set forth by the Supreme Court in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (June 16, 1969).

a. *The Card Count*: The Board adopts the findings of the Trial Examiner that the Union had majority status both on November 4, the payroll date following the November 3 letter proposal to bargain, with 273 signed cards for 500 employees in the unit, and on November 17, the payroll date when the letter was received by the Employer, with 267 cards for the 487 employees then in the unit. The Employer claims many of these cards were obtained by misrepresentations, promises and half-truths, and thus cannot be considered as expressing the employee's intent that the Union represent him.

■ Most of the signed cards clearly indicated on their face that the signer was accepting Union membership. Where cards are so plain on their face in designating the Union as bargaining agent, their validity can be undercut only if they were solicited by representations that the only purpose was to obtain an election,[9] or there is some other clear evidence of "gross misstatement" that would undermine the validity of a signed authorization card. International Union, United Auto A. A. & A. Impl. Workers [Preston Products] v. NLRB, 129 U.S. App.D.C. 196, 202, 392 F.2d 801, 807 (1967), cert. denied, 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968). "A morass of hazy individual recollections of attendant circumstances will not suffice." Amalgamated Clothing Workers of America [Hamburg Shirt Corp.] v. NLRB, 125 U.S.App.D.C. 275, 280, 371 F.2d 740, 745 (1966).

The evidence shows that in many cases the employee either read the card or asked for it. The cards were authenticated in many instances by the solicitor for the Union. *See* NLRB v. Economy Food Center, Inc., 333 F.2d 468, 471 (7th Cir. 1964), and also Colson Corp. v. NLRB, 347 F.2d 128, 134 (8th Cir.), cert. denied, 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157 (1965). In some instances where the Trial Examiner has credited the account of the solicitor, there is a conflict of tes-

8. Winn-Dixie Stores, Inc., 128 N.L.R.B. 574, at 579 (1960).

9. Sagamore Shirt, *supra*, 124 U.S.App.D.C. at 373–374, 365 F.2d at 906–907.

timony. We have noted the weight given to demeanor evidence as to credibility in the Examiner's discretion, particularly when employees are testifying long after an event and under the eye of the employer. NLRB v. Sagamore Shirt Co., 130 U.S.App.D.C. 387, 389, 390, 401 F.2d 925, 927, 928 (1968); *Preston Products, supra*, 129 U.S.App.D.C. at 202–203, 392 F.2d at 807–808.

██ The Examiner noted that forty-two cards were of the old form, with the Union authorization on the reverse side. As we noted in the *Sagamore Shirt* case, *supra*, 124 U.S.App.D.C. at 374, 365 F.2d at 907, since the card was not clear on its face as to its purpose, the "union must face the possibility that the effectiveness of the cards may be undercut by parol testimony showing that the purpose presented to the employees was that of securing an election and that the purpose of union authorization was not mentioned."

The Examiner in dealing with these forty-two cards noted that in deference to the *Sagamore Shirt* case the card was not given as great a weight:

> I have examined with special care all the testimony concerning the circumstances under which these 42 cards were signed and applied the stricter standards suggested in the cited case.

The Examiner noted that the AFL–CIO representative at every union meeting explained to the employees that by signing a card they were joining the Union, and that when fifty-one percent were signed, the cards would be used to petition for an election, but that the employees were not to sign a card just to get an election. This representative also explained at these meetings that it was possible the cards might be shown to the Employer "if it became necessary to file a refusal-to-bargain charge." The Examiner stated that most of the union cards introduced were identified by solicitors whose testimony he credited. Except when an employee requested a card, he found that for the most part the solicitor explained to the employees signing that they were

joining the Union or were helping to get a union in the plant. The fact that an election was also mentioned, he felt, did not mislead the employees as to the purpose or effect of their signing. The Examiner unfortunately only detailed the evidence concerning four of these ambiguous cards, and upheld two and left two in doubt since two cards would not affect the majority status.

The Employer is now questioning several of these cards. It does not specify how many are of the ambiguous "old type," but it does not dispute the Board's assertion that eight of the cards the Employer now disputes were of the "old type." As to five of the employees involved in these eight cases, there is evidence that the employees were told that by signing they were joining the Union. As to two other cards, there is evidence that the lady employees involved read the cards, and discussed the cards with their husbands, both of whom were union men, before signing. The eighth card questioned was one that the Examiner stated was questionable but did not affect the majority status.

██ b. *Good faith Doubt:* While an employer may refuse to bargain with a union if it has a good faith doubt as to the union's majority status, it is not justified in refusing to bargain merely to gain time to undercut a union majority. *See e. g., Sagamore Shirt* case, *supra*, 124 U.S.App.D.C. at 376, 365 F.2d at 909; *Preston Products* case, *supra*, 124 U.S. App.D.C. at 203, 392 F.2d at 808. Here there is clear evidence in the record to justify the Examiner's conclusion that the Employer had no good faith doubt as to the Union's representative status, but rather an "intent to destroy that status." As in the *Preston Products* case, there was a refusal to submit the cards to a neutral third party for verification and a concerted anti-union campaign pitted with numerous unfair labor practices calculated to undermine the Union majority and make impossible a fair election.

The Board was justified in finding a § 8(a) (5) violation in an Employer who refused to bargain with a Union that had

majority status and in requiring the Employer to bargain with the Union.

■ There is no occasion to remand for consideration of whether a bargaining order remedy is appropriate under the standards set out in *Gissel, supra*. In this case the Board adopted the Examiner's findings that a bargaining order would be required to remedy the other numerous unfair labor practices, even assuming the Employer were motivated by a good faith doubt making its refusal to bargain legal. Accordingly, affirmance of the Board's bargaining order is appropriate under the doctrine set forth in Sinclair Co. v. NLRB, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (June 16, 1969).

### 4. THE UNION'S CLAIM TO COMPENSATORY DAMAGES AND OTHER RELIEF.

As to the Union's claim to additional relief, we cannot say the Board went beyond the bounds of its large latitude and discretion in the area of remedies.

Petitions to review denied.

Application for enforcement granted.