417 F.2d 1206
 HENRY I. SIEGEL CO., Inc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
W. C. KEATON, Former Mayor of Hohenwald, Tennessee, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
AMALGAMATED CLOTHING WORKERS OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 18821.
 No. 18831.
 No. 18889.
 United States Court of Appeals Sixth Circuit.
 November 4, 1969.
 
 Joseph Martin, Jr., Nashville, Tenn., William Abramson, Hays, St. John, Abramson & Heilbron, New York City, Joseph Martin, Jr., Martin & Cochran, Nashville, Tenn., on brief, for petitioners.
 Jerome Weinstein, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Elliott Moore, Attorney, N. L. R. B., Washington, D. C., on brief, for respondent.
 Robert T. Snyder, New York City, Jacob Sheinkman, New York City, on brief, for Amalgamated Clothing Workers, etc.
 Before WEICK, EDWARDS and COMBS, Circuit Judges.
 COMBS, Circuit Judge.
 
 
 1
 The Henry I. Siegel Co., Inc., and W. C. Keaton, former Mayor of Hohenwald, Tennessee, petition for review of the National Labor Relations Board's findings that they violated Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1). The Amalgamated Clothing Workers of America ask that this Court direct modification of the Board's order and restore certain affirmative sanctions recommended by the Trial Examiner but not adopted by the Board. The Board cross-petitions for enforcement of its order. 172 N.L.R.B. No. 88.
 
 
 2
 In 1951, petitioner W. C. Keaton was elected Mayor of the Town of Hohenwald, Lewis County, Tennessee. The population of the town is approximately 3,000; Lewis County has a population of about 7,000. Keaton was re-elected without opposition until 1967. He was a strong mayor and throughout his term in office encouraged and promoted industrial expansion for his town and county. In fact, "[t]hat was the only reason [he] ran." In 1954, these efforts resulted in Henry I. Siegel Co., Inc., a manufacturer of men's clothing, agreeing to locate a new plant in Hohenwald. The company leased for a long term a building constructed with money from general obligation bonds issued by the town (40%) and the county (60%). The lease provided for rentals sufficient to retire the bonds.
 
 
 3
 The company apparently prospered in Hohenwald. There was no overt union activity until September, 1962. Activities by the Amalgamated Clothing Workers then took shape and finally resulted in the scheduling of a Board conducted election on April 9, 1965. The plant employed at that time approximately 400 persons, mostly women.
 
 
 4
 Mayor Keaton was ardent and vocal in his anti-union sentiments. He spoke against the union at a meeting of the Lewis County Civic Club; the text of his speech was that trade unions would be detrimental to economic growth, and business men were urged to stand up against the union. Shortly before the election, Keaton procured from the company a list of names and addresses of company employees. He had often obtained similar lists for use in civic campaigns in which he was interested. On this occasion the list was furnished without question and Keaton volunteered no reason for wanting it. According to the mayor, they knew he needed it for a purpose in connection with trying to secure industry.
 
 
 5
 After obtaining the employee list, Keaton approached the publisher of the Lewis County Herald, the only local newspaper. He was aware of the publisher's anti-union sentiments and suggested that the newspaper take a stand on the up-coming election. The next issue of the Herald contained an anti-union editorial which read in part:
 
 
 6
 "Now there are outsiders who have no interest in Lewis County, except the money that can be derived from industrial employees, who are seeking to unionize employees at the Henry I. Siegel Company. We understand the Amalgamated Clothing Workers of America are to hold an election in April.
 
 
 7
 We fail to see how a union can benefit employees of the Henry I. Siegel Company, which pays among top salaries in the clothing industry, and has a $1 million annual payroll in Lewis County.
 
 
 8
 WE BELIEVE a vote for the union would jeopardize the future industrial expansion of Lewis County.
 
 
 9
 WE BELIEVE you will not have as many dollars in your possession at the end of the year if the plant here is organized.
 
 
 10
 We believe you will not work as much overtime, as you now enjoy.
 
 
 11
 WE BELIEVE your fringe benefits will be no better, if as good, if your plant is organized.
 
 
 12
 WE BELIEVE there's a chance violence could erupt if the plant is organized, as has been the case in numerous other places in the state, and when it is over, we believe friendships, man's most important and cherished earthly possession would never be the same.
 
 
 13
 WE BELIEVE very few people in Hohenwald believe in this kind of actions.
 
 
 14
 WE BELIEVE, if you will think straight, rely solely on your own judgment, you will know you have nothing to gain by organizing the Henry I. Siegel Company.
 
 
 15
 * * * * * *
 
 FREE COPY
 
 16
 If you are one of the people this week that receives a free copy of the Herald, whether you are a resident of the County or work in the county, we urge you to examine it carefully and we would also invite you to become a weekly subscriber if you find it interesting."
 
 
 17
 Utilizing the employee list, Keaton had a copy of this issue of the Herald sent to all company employees.
 
 
 18
 On the day before the election, Keaton placed a two-page, three-column advertisement in the newspaper. The first column was headed "Yesterday" and recounted Hohenwald's progress in industrial employment and per capita income. The second column, captioned "Today", declared that "Hohenwald stands at the cross-roads." In this column Keaton discussed the reasons why he opposed the union. He suggested that nothing was to be gained by unionization, and continued:
 
 
 19
 "If nothing then is to be gained, what do our workers stand to lose?
 
 
 20
 (1) $10,000 to $15,000 per year in union dues.
 
 
 21
 (2) Possibly reduction in wages to those of the union.
 
 
 22
 (3) Possibly reduction of Insurance plans to those of the union.
 
 
 23
 (4) Liberty and freedom.
 
 
 24
 Can any union guarantee any improvement for our workers?
 
 
 25
 Certainly not — only promises.
 
 
 26
 Could the Company close the plant?
 
 
 27
 Certainly, see the Supreme Court ruling of last week."
 
 
 28
 The last column was entitled "Tomorrow" with a subtitle asking, "Is Hohenwald next for this?" This column contained reproductions of newspaper headlines, pictures, and stories of strike violence. One of the stories was in reference to the Supreme Court's decision in Textile Workers Union of America v. Darlington Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed. 2d 827 (1965), which upheld a company's right to go out of business after it was unionized. The mayor's advertisement is attached as Appendix "A" to this opinion. Keaton had a copy of this issue of the Herald mailed to all company employees. He also obtained additional copies of the advertisement and caused them to be placed on cars in the company's parking lot and distributed in other public places in the town.
 
 
 29
 While Mayor Keaton was thus proclaiming his views, the company was mounting its own campaign against the union. Letters were mailed to the company's employees on March 31, April 6, and April 7. The March 31 letter was signed by Sam Siegel, company vice president, and read as follows:
 
 
 30
 "Dear Friends:
 
 
 31
 For the past eleven years, the Hohenwald plant has operated in peace and harmony. Friday morning, April 9, you will have the opportunity to determine whether or not this will continue. This is a most serious decision, not only for you but for your loved one, relatives and all members of this community. The vote you cast in the election to be conducted by the National Labor Relations Board, may very well decide the future progress and industrial growth of this plant.
 
 
 32
 Therefore, in order for you to make the most intelligent decision, you must be informed of all the facts. The purpose of this letter is to place these facts before you — without prejudice — without influence. The decision will be yours alone.
 
 
 33
 THESE ARE THE FACTS.
 
 
 34
 We sincerely believe that the average hourly earnings in this plant are equal to or better than those of other garment plants in this area, union or non-union. We sincerely believe that your insurance benefits are equal to or better than those in other garment plants in this area, union or non-union.
 
 
 35
 We sincerely believe that your yearly take home pay is equal to or greater than those in other garment plants in this area, union or non-union.
 
 
 36
 To my knowledge no garment plant in this state works more regularly with more overtime opportunities than this plant.
 
 
 37
 We sincerely believe that your vacation benefits — your seniority rights — your paid holidays are comparable to those of other plants in this area, union or non-union.
 
 
 38
 The working conditions in the Hohenwald plant are the finest to be found. You work in a modern air conditioned factory which is equal in my opinion to any in this state.
 
 
 39
 THOSE ARE THE FACTS, SIMPLE, CONCISE AND CLEAR.
 
 
 40
 Union organizers can not present you with any facts. They only make promises. Their promises are entirely irresponsible. Irresponsible because they are in no position to assure you that they will be fulfilled. The union itself, no matter what they promise you CAN NOT SET PRODUCTION STANDARDS — CAN NOT CHANGE WORKING — CONDITIONS — CAN NEITHER HIRE NOR FIRE — NOR MAKE ANY CHANGES WHATSOEVER IN PLANT OPERATIONS. The union can guarantee you nothing.
 
 
 41
 REMEMBER! ONLY THE COMPANY
 PROVIDES JOBS.
 ONLY THE COMPANY PAYS
 INSURANCE BENEFITS.
 ONLY THE COMPANY MAKES
 VACATION AND PAID HOLIDAYS
 POSSIBLE.
 
 
 42
 What can the union do? They can collect dues, levy fines and assessments. Control your actions as an employee. Call strikes.
 
 
 43
 Look around you in a neighboring community the results of union agitation are easy to be seen. Violence — loss of work — disruption of community relations — destruction of private property — a town divided. Do you want this for Hohenwald? I hope this letter has served its purpose to acquaint you with the facts so that you can make an intelligent decision. I urge you on Friday, April 9th, to vote for continued peace and harmony in this community; to vote for future progress and industrial growth. This can be done by simply VOTING NO.
 
 
 44
 Sincerely yours,
 (s) Sam Siegel"
 
 
 45
 The April 6 letter was also signed by Sam Siegel and read thus:
 
 
 46
 "Dear Friends:
 
 
 47
 The day of decision is fact [sic] approaching. Friday morning, you will vote if this plant is to be unionized. You will vote in the tried and true American way — by secret ballot. You will be alone in the voting booth. No one will ever know how you voted. The will of the majority will rule.
 
 
 48
 The importance of your vote can not be overemphasized. If you fail to vote you are letting someone else decide for you. This decision which may affect your industrial future is too important to leave to others. No matter what your sympathies — you owe it to yourself to express your opinion.
 
 
 49
 REMEMBER; YOU CAN VOTE AGAINST THE UNION WHETHER YOU SIGNED A UNION CARD OR NOT!! The mere signing of a union card is not binding. If any union organizer or union sympathizer told you that signing a cards means you must vote for the union, that statement is simply not true. You are a free agent. You can vote any way you see fit, under no obligation whatsoever.
 
 
 50
 Furthermore, if any union organizer told you that the union, itself, can arrange things so that you work less and get as much or more pay, that statement is simply not true. In the final analysis it is the company, alone that provides jobs, creates payrolls and bears the whole responsibility for the operation of this plant.
 
 
 51
 One thing is certain with a union comes dues, fines and assessments — and the possibility of strikes — violence and loss of work. The rest of the rosy picture the union paints is nothing but empty promises — that they do not have the power to guarantee.
 
 
 52
 There is only one realistic way to continue the past eleven years of progress in this plant. That is to do what you have been doing. The spirit of cooperation and harmony that you have exhibited during this long period has made the benefits that you receive possible.
 
 
 53
 In closing, let me repeat you must exercise your right to vote and by your absence not permit others to exercise it for you. A vote against the union will assure the continued progress of the plant and the spirit of cooperation and harmony that we have all enjoyed in the past. Friday morning — you owe it to yourself to VOTE NO.
 
 
 54
 Sincerely yours,
 (s) Sam Siegel"
 
 
 55
 On April 7, Herbert Honick, plant manager sent a letter to all employees:
 
 
 56
 "LADIES — FELLOWS
 
 
 57
 It was my intention to remain silent and not pass any of my private thoughts on to you before the election tomorrow. But as election time draws near, I can't help but feel that I would be letting all of you down if I didn't mention something that is of utmost importance to you and me.
 
 
 58
 I need not spend time listing the wild promises you have received and then shooting holes through them — all of us know that baloney!
 
 
 59
 I am concerned with the possible loss of a wonderful privilege that we both enjoy — that of the two of us sitting down face to face — two free human beings, and discussing our mutual problems. You know that now, as in the past, all it takes to see me is to walk into my office. Problems of all kinds are discussed — personal ones as well as those relating to work. No one has ever left my office without knowing that everything humanly possible would be done to solve these problems. These problems are resolved on a personal basis — not by a committee — not by filling out forms that are passed around from one person to another to be read on a certain day of the week.
 
 
 60
 The relationship, that we both know works, would end if a union is voted in tomorrow. I don't think you want this. You can express your desire for this kind of relationship to continue by voting NO tomorrow.
 
 
 61
 Sincerely,
 (s) Herb
 Herb Honick
 
 
 62
 P.S. If by any chance you need transportation in order to vote Friday call me at the factory phone number 796-3241 or my home phone, number 796-3203. I will see to it that you get a ride."
 
 
 63
 The day before the election, Jesse Siegel, company president, spoke to assembled employees. He said in part:
 
 
 64
 "More than a decade ago this plant was opened. It was in many ways a cooperative venture between the people of Hohenwald and Lewis County and the Siegel Company. Your elected city and county officials agreed to raise the money through a bond issue and the Siegel Company agreed to sign a lease guaranteeing the payment of these bonds. We also agreed to provide employment to the fullest extent. Right from the beginning, then — the opening of the Hohenwald plant was a kind of partnership between the people of this community, you included, and the Henry I. Siegel Company.
 
 
 65
 * * * * * *
 
 
 66
 People are asking what will happen to the insurance plans they now have if the union is voted in? That is an unanswerable question. It will be a subject for negotiation. No one, union organizers included, can tell you now what the results will be, however I can tell you that the plan you now have will continue if the union is not voted in.
 
 
 67
 * * * * * *
 
 
 68
 In the same way that this plant was a cooperative venture from the beginning — in all fairness I must vigorously proclaim that all the benefits I have enumerated could not have materialized without your cooperation.
 
 
 69
 * * * * * *
 
 
 70
 This combination of less work and more money is at the heart of the union promise. I sometimes wonder if they think you have no intelligence at all, if they take you to be so foolish as to believe that they have the power to make this come true, when all the evidence tells an entirely different story.
 
 
 71
 Let's suppose that their wild promise could be realized — what would it mean. In our highly competitive industry, the ability to manufacture goods competitively is of prime importance if a plant is to operate successfully. There are hundreds of pants manufacturers throughout the country who would immediately be in a position to cut into your work. This kind of irresponsible promise reveals the short sightedness and shallow nature of the union's interest in the future of our plant. They feel you understand so little about the true situation that you will grab the bait without noticing the hook in it. In my opinion, if such a promise could come true it might well be the beginning of the end of the progress of the Hohenwald plant."
 
 
 72
 President Siegel then spoke of the violence which had occurred at other places after the union had come and told the employees "to look around you in your neighboring community, to see the destructive forces of unionism," where the city was "torn with strife, violence — law breaking — hostility between neighbors and loss of work." He asked the employees whether they wanted to "disturb the peace and harmony of this plant for the irresponsible promises of the union and the doubtful privilege of paying dues?" He concluded his talk by saying that "the decision tomorrow will be yours;" that the employees' decision would be respected by the company. He urged them to vote and then return to work in a spirit of good neighborliness.[1]
 
 
 73
 Upon these facts the Board found that the company and Keaton, acting as a company agent, had violated Section 8(a) (1) of the Act. It is stated in the order that the violation is attributed to him [Mayor Keaton] solely on the basis of his agency relationship with respondent Siegel. The company and Mayor Keaton are required by the Board's order to cease and desist from the unfair labor practices found and to post a notice for sixty days. The notice reads in relevant part:
 
 
 74
 "WE WILL NOT directly or indirectly threaten any employee with plant shutdown, strikes, violence, job loss, discharge, reduction of overtime or of other work opportunities, * * *.
 
 
 75
 WE WILL NOT directly or indirectly threaten any employee that union membership is futile since no advantage would be derived therefrom * * *.
 
 
 76
 WE WILL NOT directly or indirectly threaten, inform or advise any employee that in the event of unionization he will no longer be able to exercise the right to present individual grievances or complaints to or discuss mutual problems affecting his employment directly with his employer.
 
 
 77
 * * * * * *
 
 
 78
 WE WILL NOT directly or indirectly threaten any employee that he will be better off and have more to gain by dealing with his employer individually instead of through a union.
 
 
 79
 WE WILL NOT directly or indirectly in other manner interfere with, restrain, or coerce, any employee in the exercise of his right to self-organization; * * *."
 
 
 80
 In addition to the sanctions ultimately adopted by the Board, the Trial Examiner recommended an order which would have given the union equal time with company officials to address employees at the plant; access to plant bulletin boards; and names and addresses of company employees. The recommended order would have required the company to post a notice for six months and to mail a copy of the notice to all employees; also to insert a double page advertisement of the notice in the Lewis County Herald. This advertisement also was to be mailed to all employees. It is these additional sanctions that the union seeks to have reinstated.
 
 
 81
 We are faced at the outset with the question whether there was substantial evidence to support the Board's finding that Mayor Keaton was acting as the agent of the company within the meaning of 29 U.S.C. § 152. An employer is defined in § 152(2) as any person acting as an agent of an employer, directly or indirectly. Subsection (13) provides that the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling. Within these guidelines, we are unable to avoid the conclusion that the mayor did act as agent of the employer. It is apparent from this record that Mayor Keaton, both as an individual and as an official of the town, had a vital interest in the success of Siegel's Hohenwald plant. He had sponsored the bond issue which provided the funds for construction of the plant and rental payments by the company were earmarked for retirement of the bonds. He was convinced — and we have no doubt about his good faith — that the coming of the union might endanger the plant's success. He was a personal friend of the company's vice president, Sam Siegel, and had visited with him through the years; both men belonged to the Lewis County Civic Club where the consequences of unionism was a topic of discussion. When the representation election was imminent, the mayor obtained from Sam Siegel a list of names and addresses of employees which he used to circularize the employees with the anti-union editorial and his own newspaper advertisement against the union. (The union's request for a voter eligibility list was refused.) The mayor had copies of the newspaper containing his advertisement distributed in the company parking lot the day before the election, shortly after the company president, Jesse Siegel, had spoken to the employees.
 
 
 82
 The approach taken in the newspaper editorial, in Sam Siegel's letters, in Jesse Siegel's speech, and in the mayor's advertisement was very similar. The only real difference was that the Siegels' utterances were somewhat more restrained. Following the representation election on April 9, Mayor Keaton went to the company's plant at the invitation of Sam Siegel to arrange for police to keep a lookout "in case there was any vandalism or anything around there." The employees of the plant in this small, closely knit community, where any man's business is everybody's concern, could hardly believe that the mayor was acting entirely on his own without the knowledge and approval of company officials. The remarkable parallelism between the statements of the mayor and those of company officials could hardly be considered as mere coincidence. The company officials did nothing to disavow their responsibility for the mayor's actions but we do not reach the question of failure to disavow. If doubt remained about the company's approval of the mayor's actions, it was effectively removed by president Siegel's speech the day before the election. On two occasions during his talk, he told the employees that operation of the Hohenwald plant was a cooperative venture by the company and the town and county. At another point he said, "The opening of the Hohenwald plant was a kind of partnership between the people of this community, you included, and Henry I. Siegel Company." The employees knew, of course, that Keaton was the mayor and as such spoke for the town. It is a reasonable assumption, too, that they knew a partner has authority to speak for the partnership. Consequently, the employees had it from "the horse's mouth" that the town and the company were working in tandem for what they considered to be the best interest of the company. Clearly, the Board had before it substantial evidence from which to find the mayor acted as the company's agent within the meaning of the statute.
 
 
 83
 We look now to whether the activities of the company and the mayor when considered together were violative of Section 8(a) (1) of the Act. We hold they were. Section 8(c) of the Act gives an employer the right to express his opinion in opposition to the union, also the right to express argument in support of such opinion. But, his expressions may not contain a threat of reprisal. He may not dress up a threat in the language of opinion. Even though his statements may be expressions of opinion only, if their reasonable tendency is coercive in effect, they are violative of Section 8(a) (1). N. L. R. B. v. Kingsford, 313 F.2d 826 (6th Cir. 1963); N. L. R. B. v. Ford, 170 F.2d 735 (6th Cir. 1948).
 
 
 84
 It is often difficult to determine whether statements of the employer are permissible forceful argument in opposition to the union or a veiled threat to the employees in the event the union should win the election. Surprenant Manufacturing Company v. N. L. R. B., 341 F.2d 756 (6th Cir. 1965). If the inference or conclusion found by the Board that the statements constitute a threat is a reasonable one, its findings will not be set aside on review even though a different inference or conclusion may seem more plausible. Morse Instrument Company v. N. L. R. B., 388 F.2d 1 (6th Cir. 1967); Surprenant Manufacturing Company v. N. L. R. B., supra; N. L. R. B. v. Electric Steam Radiator Corporation, 321 F.2d 733 (6th Cir. 1963). In making its determination, the Board has the right to consider the total context within which the activities occur. N. L. R. B. v. Sinclair Co., 397 F.2d 157 (1st Cir. 1968); Daniel Construction Company v. N. L. R. B., 341 F.2d 805 (4th Cir. 1965). Moreover, the Board is justified in determining the question of coercion or threat of reprisal from the standpoint of employees over whom the employer has a measure of economic power. The fact that the town's largest employer and the mayor possess more economic power, comparatively, in a small community than in a large city is a proper subject for consideration. Amalgamated Clothing Workers of America v. N. L. R. B., 125 U.S.App.D.C. 275, 371 F.2d 740 (1966).
 
 
 85
 The statements which we have found are attributable to the company fall in the category of thinly veiled threats rather than mere predictions or legitimate argument in support of opinions. The mayor's statements are the most extreme. He states in plain words what company officials suggest more gingerly. He tells employees in language which is more than merely an expression of opinion that they stand to lose by a possible reduction in wages and a possible reduction of insurance plans if they vote for the union.
 
 
 86
 We think the mayor's statement that the company could close the plant was an implied threat when considered in light of the statements of company officials. True, he cited the Darlington case and included in his advertisement a tear sheet from a newspaper containing a reporter's analysis of the Supreme Court opinion. However, we doubt if anyone, the mayor included, expected the employees of the Hohenwald plant to familiarize themselves with the Darlington opinion within the twenty-four hours which remained before the election.
 
 
 87
 The mayor's statements about strife and violence, when coupled with company officials' prediction of an end to the spirit of cooperation and harmony which might well be the beginning of the end of the progress of the Hohenwald plant, was an implied threat rather than an expression of opinion.
 
 
 88
 The letter of plant manager Herb Honick was on its face a threat that the personal relationship between him and the employees would cease if the union came in. His letter recited the benefits of such relationship and then concluded, "the relationship, that we both know works, would end if a union is voted in tomorrow." Also, that part of his letter in regard to employees not having the continuing right to present their problems in relation to work was inaccurate. Under Section 9(a) of the Act, any individual employee has the right to present grievances to the employer and have such grievances adjusted so long as the union is given an opportunity to be present and the adjustment does not violate the collective bargaining agreement.
 
 
 89
 Implicit in the mayor's statements and those of the company officials is the threat that, if the union came in, the personal concern which the company had shown for its employees would be withdrawn and they would be left to fend for themselves in an atmosphere of strife and violence created by the union. The cumulative effect of their statements was more than a prediction or argument in support of an opinion.
 
 
 90
 The union argues with considerable force that the Board's order is not adequate and that the broad sanctions recommended by the Trial Examiner should have been adopted. We are reminded that the Siegel Company has been found guilty of unfair labor practices at one or more of its plants on numerous occasions in the past. 140 N.L. R.B. 1292 (1963); 143 N.L.R.B. 382 (1963), enforced 328 F.2d 25 (2nd Cir. 1964); 147 N.L.R.B. No. 78 (1963), enforced 340 F.2d 309 (2nd Cir. 1965); 148 N.L.R.B. 1192 (1964); 165 N.L.R.B. No. 56 (1967). The repetitive pattern of the company's conduct is emphasized as justification for the unusual remedy recommended by the Trial Examiner. After careful consideration, we have concluded that we should not modify the Board's order so far as it applies to the Siegel Company. Under Section 10(c) of the Act, the Board has broad discretion to fashion appropriate remedies. Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); N. L. R. B. v. Seven-Up Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953). We cannot say here as a matter of law that the Board should have imposed stronger sanctions.
 
 
 91
 The former mayor strongly contends that his statements were protected by the First Amendment to the Constitution, especially since he was a public official when the statements were made. We do not consider it necessary to go into that question since the Board makes it clear that its order applies to Keaton only as an agent of the company. It is not often that a public official is named as respondent in a proceeding before the National Labor Relations Board but there is precedent for such action — Dean Industries, Inc., and Howard Stafford, Mayor of Pontotoc, Mississippi, 162 N.L.R.B. 106. Moreover, 29 U.S.C. § 152 (2) includes within its definition of employer any person acting as an agent of an employer.
 
 
 92
 We are concerned about the legal propriety of that part of the Board's order which requires affirmative action by former Mayor Keaton. He is now a private citizen and is named in the order only because the Board found he acted as the company's agent. This being so, there is no reason why notice to the company's employees should be signed by Keaton and no reason why he should be required to sign a notice to the Regional Director. Notice by the corporation will necessarily include all those acting as agents for the corporation. If this shoe fits Keaton, he will be included. The order will be modified so as not to require affirmative action by W. C. Keaton.
 
 
 93
 We are also of the opinion that the second and fifth paragraphs of the notice attached to the Board's order are too broad. Those paragraphs read:
 
 
 94
 "WE WILL NOT directly or indirectly threaten any employee that union membership is futile since no advantage or benefit would be derived therefrom which would not be derived in the absence thereof.
 
 
 95
 "WE WILL NOT directly or indirectly threaten any employee that he will be better off and have more to gain by dealing with his employer individually instead of through a union."
 
 
 96
 The foregoing language comes perilously close to infringing upon the First Amendment rights of the parties. Aside from that, such sweeping language is not needed to accomplish the purpose of the Act. The second and fifth paragraphs (set out above) will be eliminated from the notice and the following language substituted therefor:
 
 
 97
 "WE WILL NOT directly or indirectly threaten any employee with loss of economic benefits or changes in working conditions as a result of his joining a union."
 
 
 98
 The Board's order will be modified as herein directed and as so modified will be enforced.
 
 
 
 Notes:
 
 
 [1]
 The union lost the election 223 to 159. The Board found employer misconduct and ordered a new election which, so far as is shown by the record, has not been held
 
 
 
 99
 WEICK, Circuit Judge (dissenting).
 
 
 100
 In my judgment, there is not substantial evidence from which the Board could find that W. C. Keaton, former Mayor of Hohenwald, acted as the agent of the Company.
 
 
 101
 None of the facts relied upon by the majority or the Board is, in my opinion, sufficient, considered separately or in totality, to justify the finding that Mayor W. C. Keaton acted as an agent for the Company. Instead, the facts convey the clear conclusion that Mayor W. C. Keaton acted to protect what in his view was the best interest of Hohenwald and its people whom he represented. The Board's order erroneously finds that the Mayor was representing the Company instead of his own community.
 
 
 102
 The majority view that Keaton acted as the Company's agent is based upon findings of the Board that he and Sam Siegel were friends; that Keaton obtained a list of the names and addresses of the employees from the Company; that he had copies of the newspaper editorial and his advertisement circularized to plant employees; that a parallelism existed between the Mayor's and the Company's statements; that the Company told its employees what was common knowledge, i. e., that the plant was a cooperative venture of the Company and the town and county.
 
 
 103
 Keaton had been the driving force for industrialization of the Hohenwald area. His statements at the Civic Club meeting in February, 1963, indicate his view that the only way Hohenwald could attract industry was to keep organized labor out of the area. Thus, Keaton was interested in opposing unionization of the plant because he felt that it would destroy Hohenwald's ability to attract industry. In point of fact, the need to attract industry was the "only" reason he ran for mayor.
 
 
 104
 Pursuant to Keaton's interest in attracting industry, he helped negotiate with the Company a 20-year lease-purchase contract which provided municipally subsidized financing for the construction of the Company's factory. As a result of this activity, Keaton and Sam Siegel became good friends.
 
 
 105
 The Board concedes in its Brief that Keaton "customarily received information about the plant's industrial make-up whenever he wished. * * *"
 
 
 106
 The Company asked no questions and was given no reason for Keaton's request for the list of employees. There is no evidence whatever that the Company knew Keaton's purpose in obtaining the list. Nor is there any evidence that the Company was aware of the content of either the editorial or the advertisement prior to their publication. On the contrary, the uncontradicted evidence indicates that Keaton prepared and paid for the advertisement and for its distribution and that of the editorial.
 
 
 107
 Under such circumstances and in view of the fact that the advertisement was signed by Keaton, it would be unreasonable to require the Company to disavow what the Mayor did and said.
 
 
 108
 The uncontradicted proof is that Keaton acted independently of the Company for what he considered to be the best interest of his community. So far as this record indicates, he never revealed his plans to the Company. The execution of those plans and the cost thereof were his own. The Company initiated nothing and it encouraged nothing. The Company in this case is held liable for Keaton's action simply because it happens to have been beneficial to the Company in its attempt to avoid unionization. Certainly the Company was not obligated to disavow the statements of a public official simply because his statements happened to coincide with the Company's view of its own interest. Nor should it be held that a public official can not freely express his views on matters of public interest when those views are his own and are not the result of solicitation by or connivance with the party in whose favor they are made.
 
 
 109
 Although Keaton may have been mistaken in his belief of what was best for the community, and even though the Company may have benefited indirectly from his statements, Keaton did not purport or intend to act for the Company. Even under the Act's relaxed agency requirements, this record is devoid of evidence sufficient to show an agency relationship between Keaton and the Company. The Act cannot, however, relax the First Amendment rights of a public official to free speech. Cf., Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Nor are these constitutional rights lessened because the Board has labeled the Mayor an agent of the Company.
 
 
 110
 The other matter which in my judgment is wholly wrong, is the Board's order insofar as it pertains to Keaton. The Trial Examiner recommended an order requiring the Company and Keaton as Mayor to cease and desist from the unfair labor practices found, and from interfering with, restraining or coercing employees in the exercise of their Section 7 rights. The Board's order, however, is against the Company and Keaton as former Mayor, since his term of office as Mayor had expired. Apparently Keaton is now being penalized as an individual for what he did and said in his capacity as Mayor and without any finding that after his term of office as Mayor had expired he continued individually to act as agent for the Company. In my opinion, the Board is without power to impose consequences on an individual in his later life for what he did in his capacity as a public official.
 
 
 111
 The Board's finding against the Company is premised on the combined activities of Company agents and of Mayor Keaton.
 
 
 112
 I would deny enforcement of the order of the Board against Keaton and remand to the Board for consideration of the sufficiency of the evidence to support a finding of an unfair labor practice against the Company without regard to Mayor Keaton's activities. NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE