NATIONAL LABOR RELATIONS
BOARD
v.
MISSISSIPPI PRODUCTS, Inc.
No. 14753.

United States Court of Appeals
Fifth Circuit.
June 18, 1954.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Arnold Ordman, Jean Engstrom, Attys., National Labor Relations Board, Washington, D. C., for petitioner.

Samuel Lang, Kullman & Lang, New Orleans, La., for respondent.

Before BORAH and RUSSELL, Circuit Judges, and DAWKINS, District Judge.

RUSSELL, Circuit Judge.

The National Labor Relations Board has petitioned this court for a decree enforcing an order[1] entered against Mississippi Products, Inc. The order directs respondent to cease and desist from interrogating its employees, directly or under the guise of interviewing them as prospective witnesses, as to their union membership, activities, sympathies, or possession of union cards and from warning them to avoid union adherents. It further directs respondent to post the usual notices of compliance.

This broad order is predicated upon a finding of unfair labor practices attributed to respondent which arise solely from the conduct of its personnel clerk, Frank Marron, relative to his conversations with three of respondent's employees. Although Marron was not a supervisor and it is not contended that he was acting at the direction of the employer, or that his activities were known to, or ratified by, respondent, for reasons hereinafter stated the Board held that respondent was responsible for his conduct. Respondent urges that it was not, but submits that even if it were the statements and conduct of Marron were privileged. Finally, it asserts that if these two defenses should fail, in view of the comparative isolation of the incidents complained of, the order of the Board should not be enforced.

Concededly, respondent did not welcome the union organizational campaign which, following closely on the heels of the last of several similar drives by other unions, began at its plant in Jackson, Mississippi, in the latter part of October, 1951. It went on record as opposing the unionization of its plant, as it had a right to do, by making speeches to its employees over the public address system and by publishing articles in its plant newspaper. At the time respondent had approximately 85 production supervisors in its plant and an employee force of more than 750. This force fluctuated with seasonal demand between that figure and some 1500 employees. From this substantial number of supervisors no complaint arises as to any interference in the union activities, and, as stated, only three employees of this number are concerned in any way.

Marron was employed under the supervision of the personnel manager. He had a variety of duties which included handling interviews on employee benefits, insurance and profit sharing, gathering news for the company publication, managing the company athletic teams and conducting visitors through the plant. Shortly after the union drive started, Marron was asked to, and did, read a prepared speech over the public address system, which was operated from his office. This speech was decidedly antiunion and was designed to discourage the employees from being influenced by union workers who were then passing out circulars and membership cards at the company gate. It is not contended that the speech in any way constituted an unfair labor practice. This identical speech was read over the public address system an hour later by respondent's personnel manager.

During the height of the union campaign Marron had four conversations with three different employees relative to the union activities which were found

by the Board to have interfered with, restrained or coerced the employees in the exercise of their guaranteed rights. Two of these conversations were with Dear. On one occasion he asked Dear if he had attended a union meeting the preceding night. On the second occasion he inquired of Dear whether he was "mixed up in this union business", stating that a "union stooge" had said that he was. Upon receiving a negative reply, Marron observed that Dear had a good record with the respondent and prospects of a good future. He admonished Dear to "stay away from them boys or they"ll get you in trouble." Employee Russell testified that Marron once asked him if he knew anything about the union. When Russell stated that he did not, Marron pointed out another employee and said, "We have a few organizers around here. There's one right over there." Marron asked a third employee, Meadows, if he knew anyone who had union cards. When Meadows gave a negative answer, Marron told him that he had heard that Mullins had some.

After the complaint had issued in the present proceeding, Marron, having been informed that his conversations with Dear were charged as unfair labor practices, approached Dear and, in a manner which led Dear to believe that he was aping a Government attorney, interrogated him in a joking way concerning the earlier conversations.[2] At a later date Marron called Dear into his office and asked him why he had been avoiding him. When Dear indicated that he was concerned over having received a subpoena to testify before the Board, Marron assured him that there was nothing to worry about. Although Dear's version of the previous conversations differed in minor respects from that of Marron, the latter told him to tell the truth to the best of his knowledge, "That's all right. We don't want nothing to come between our friendship."

The trial examiner found that Marron was not a supervisor within the meaning of the Act, but concluded that respondent was responsible for his conduct for reasons stated in the margin.[3] The facts of this case are not comparable to the facts recited in the authorities relied upon by the Board.[4] In each of those cases the employer actually had

2. Marron asked Dear the following questions and received the answers indicated:
"Q. Do you know Frank Marron? A. Yes, sir.
"Q. Did Frank Marron even mention a union in any respect to you? A. No sir.
"Q. Has any foreman ever mentioned a union in any respect to you, or threatened you? A. No, sir, there hasn't.
"Q. You know, you're on your honor now, don't you? A. I hear you now.
"Q. You'll probably get a subpoena, so say what you want to say."
Marron questioned Russell in a similar manner and admitted that he also questioned Meadows and "quite a few" others, telling them that he had been accused of having asked questions of people in the plant about their union activities and he wanted to know if they recalled any occasion when he had questioned them.

3. " * * * there is scant question that Marron occupied a strategic position to translate to the employees the policies and desires of management and that he was unquestionably identified with management in the eyes of the employees in such a way as to cause them to look to him for guidance regarding the respondent's policies.
"That conclusion, based on the entire evidence, rests mainly on the following facts; (1) Marron occupied a private office * * *, and until recently the public address system was operated from it. (2) It was Marron whom Rutledge selected to make to the employees over the public address system the antiunion speech of November 9, in which Marron was obviously speaking as the voice of management. (3) Marron served ostensibly as editor of The Cabineteer. (4) Marron was manager of Respondent's athletic teams, composed of employees."
In addition, the Board, in approving the findings of the trial examiner, noted that Marron was in charge of certain aspects of respondent's personnel relations.

4. Among others, International Association of Machinists, Tool and Die Makers Lodge No. 35 v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; Sewell Hats, Inc., v. N. L. R. B., 5 Cir., 143

knowledge of the conduct of the person, or persons, for which it was held responsible and either openly condoned it, participated in it, or in some way affirmatively indicated its approval. There is nothing in the record which suggests that respondent knew of Marron's activities at any time. Nevertheless, we agree with the Board that since respondent clothed Marron with apparent authority to speak for it and *did actually on one occasion use his voice to make an antiunion speech* it "may fairly be said to be responsible" for his conduct. International Association of Machinists, Tool and Die Makers Lodge No. 35 v. N. L. R. B., 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50. The term "employer", as used in the amended Act, includes any person acting as an agent of the employer, directly or indirectly.[5] In determining whether any person is acting as an agent of the employer, the question of whether the specific acts performed were actually authorized or subsequently ratified is not controlling.[6]

This leaves for decision the question of whether Marron's remarks to Dear and his interrogation of the three employees and related conduct violated section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1). The examiner considered Marron's statement to Dear advising him to stay away from the union organizers, as a warning and without further discussion held that the interrogations and "warning" violated the Act. Considering the post-complaint interrogations separately, the examiner recognized that "they were undertaken by Marron *sua sponte*" and did not constitute an effort to persuade the employees to change their testimony or to interfere in the giving of it, but held that it aggravated the coercive effect of the original interrogations.

■■ Our attention is called to the fact that the Board has held that the interrogation of employees as to certain aspects of union activity per se violates section 8(a) (1), supra.[7] Although this principle is not here urged in support of the Board's petition, we call attention to the fact that it has not been followed by this court. N. L. R. B. v. Fuchs Baking Co., 5 Cir., 207 F.2d 737; N. L. R. B. v. Reynolds & Manley Lumber Co., Inc., 5 Cir., 212 F.2d 155 or by the Courts of Appeal generally.[8] It is the purpose of section 8(a) (1) to protect employees from employer interference, restraint and coercion in the exercise of their right to self-organization. The cited cases hold generally that inquiries unaccompanied by threats of reprisal, express or implied, do not thwart the purpose of the Act nor constitute unfair labor practices.

■ It is true that respondent was opposed to the unionization of its plant and, by means of speeches and written articles appearing in its newspaper, expressed its opposition openly. These expressions however, as found by the examiner, were free of threat of reprisal or promise of reward. Under these circumstances, particularly in the absence of any illegal antiunion history on the part of respondent, we are unable to approve a finding that Marron's interrogation of three of its more than 750 employees interfered with, restrained or coerced them in the exercise of their right to self-organization. N. L. R. B. v. England Bros., Inc., 1 Cir., 201 F.2d 395. If it were conceded that Marron was acting on behalf of, indeed, at the direction

F.2d 450; N. L. R. B. v. Port Gibson Veneer & Box Co., 5 Cir., 167 F.2d 144; Valley Mould & Iron Corp. v. N. L. R. B., 7 Cir., 116 F.2d 760; N. L. R. B. v. Fred P. Weissman Co., 6 Cir., 170 F.2d 952.

5. 29 U.S.C.A. § 152(2).

6. 29 U.S.C.A. § 152(13).

7. Standard-Coosa-Thatcher Co., 85 N.L. R.B. 1358. See N. L. R. B. v. Syracuse

Color Press, Inc., 2 Cir., 209 F.2d 596, and the dissenting opinion of Chief Judge Chase, at page 600.

8. N. L. R. B. v. Montgomery Ward & Co., 2 Cir., 192 F.2d 160; N. L. R. B. v. Tennessee Coach Co., 6 Cir., 191 F.2d 546; Sax v. N. L. R. B., 7 Cir., 171 F.2d 769; N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 194 F.2d 370; Wayside Press v. N. L. R. B., 9 Cir., 206 F.2d 862; Atlas Life Ins. Co. v. N. L. R. B., 10 Cir., 195 F.2d 136.

of, respondent, his conduct was "more indicative of a natural business interest than of any interference, restraint or coercion." N. L. R. B. v. Fuchs Baking Co., supra. Even if, in view of the friendly relationship between the two men, Marron's comments to Dear could reasonably be said to have constituted a veiled threat of reprisal, this single incident could hardly be said to amount to, especially in the light of the record as a whole, a sufficient basis for convicting the respondent of the charge of the commission of an unfair labor practice so as to support the Board's order.[9] As for the post-complaint interrogations, see footnote 2, while Marron's conduct was in bad taste, we do not find substantial evidence in the record to support a finding that it was coercive. Furthermore, in view of our holding that the original conversations did not violate the Act, it could hardly be said that the subsequent conduct was an "aggravation of the coercive effect of his original interrogations."

Enforcement denied.

---

9. Cf. N. L. R. B. v. Hart Cotton Mills, 4 Cir., 190 F.2d 964, 973–974; N. L. R. B. v. Hinde & Dauch Paper Co., 5 Cir., 171 F.2d 240.