### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### LAKE BUTLER APPAREL COMPANY, Respondent.

### No. 24687.

United States Court of Appeals
Fifth Circuit.
March 25, 1968.

set aside unless clearly erroneous applies to habeas corpus proceedings.

Allen J. Berk, Atty., N. L. R. B., Washington, D. C., for petitioner.

Daniel R. Coffman, Jr., Jacksonville, Fla., for respondent.

Before BELL, GOLDBERG and DYER, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge.

The Board seeks enforcement of its order holding that Respondent violated §§ 8(a) (1) and 8(a) (5) and (1) of the Labor-Management Relations Act. 29 U.S.C.A. §§ 158(a) (1) and (5). The § 8(a) (1) violation is based on alleged coercion of employees in the exercise of their rights guaranteed by § 7 of the Act. 29 U.S.C.A. § 157. The § 8(a) (5) violation is said to arise from the refusal of Respondent to recognize and bargain with the Amalgamated Clothing Workers of America, AFL-CIO, as the representative of a majority of Respondent's employees on and after April 19, 1964.[1] The order will be enforced as it relates to the § 8(a) (1) violation but not for all of the reasons assigned by the Board. Enforcement will be denied as to the § 8(a) (5) violation.

Respondent is in the apparel manufacturing business in Lake Butler, Union County, Florida. The union began an organizing campaign among Respondent's employees in February 1964 by obtaining signed authorization cards. The union posted a letter from New York on April 15, 1964 to Mr. Stephenson, owner and president of Respondent, advising that the union had been designated by a majority of his employees as their collective bargaining representative, and requesting an appointment in order to arrange for a card check and to commence collective bargaining negotiations. The letter stated that a reply was expected within three days. Mr. Stephenson received this letter on April 19 upon his return from an out of town trip. It reached his office on April 18.

On April 17, two days before Mr. Stephenson received the letter, the union filed a petition with the Regional Office of the Board in Tampa, Florida, requesting that it be certified as the representative of Respondent's employees. The petition was docketed in the Tampa office on Monday, April 20 and a copy was mailed immediately to Mr. Stephenson who received it on April 21. He was advised that a Board representative would contact him at an early date and full cooperation was requested. On the same day, the Regional Director through a Jacksonville staff member advised Mr. Stephenson by letter that a secret ballot vote would be held among his employees pursuant to the petition filed by the union. Stephenson, upon receipt of this letter on April 22, promptly telephoned the staff member that he would voluntarily consent to an election and that any date for the election was agreeable. He was then sent an election agreement and the election was held on May 11. Meanwhile, nothing further had been heard from the union. No demurrer of any kind was lodged to holding the election in lieu of recognition based on the cards without an election. The union lost the election by a large margin[2] and the complaint which forms the subject matter of the proceedings before us followed.

---

[1.] See 158 NLRB No. 85 for the report of the decision and order of the Board.

[2.] Seventy four votes were cast; twenty for the union, fifty one against, and three votes were challenged. One of these disputed ballots was cast by employee Griffis. The finding that he was a supervisor is sustained.

The theory of the complaint and of the order is that the company frustrated the election by engaging in activities in violation of § 8(a) (1) of the Act. The Trial Examiner agreed and held, under these circumstances, that the company should be required to recognize the union as the bargaining representative of the employees. Having reached this point, the conclusion followed that Respondent also violated § 8(a) (5) and (1) by refusing to bargain with the union as the representative of the employees. This conclusion, of course, rests on the premise which we find unwarranted that the union represented a majority of the employees by virtue of card authorization. With one minor exception, the Board simply adopted the findings, conclusions, and recommendations of the Trial Examiner.

### I.

■ The findings and conclusions with respect to the § 8(a) (1) violations have to do in the main with threats on behalf of management to close Respondent's plant to avoid the union. Some of the threats were made by supervisory personnel including the wife of the owner. Others were made to individual employees by certain members of the Board of Directors of the Union County Development Authority. The Authority had promoted and financed Respondent's plant and, to some extent, was financing its current operations. The Authority and all of its directors were made Respondents as agents of the Respondent company and the cease and desist order runs against them as agents.

Another threat, somewhat veiled, came in the form of a speech to the employees by Mr. Stephenson. It is argued that this speech was an effort to dissipate the effect of the prior threat or rumor that the plant might be closed if the union won the election. We agree with the Board, based on construing the speech in light of the prior threats, that it tended to substantiate the previous threats. It exceeded mere economic prophesy. Cf. Southwire Company v. NLRB, 5 Cir.,

1967, 383 F.2d 235; NLRB v. Brownwood Manufacturing Company, 5 Cir., 1966, 363 F.2d 136; Texas Industries, Inc. v. NLRB, 5 Cir., 1964, 336 F.2d 128; NLRB v. Transport Clearings, Inc., 5 Cir., 1963, 311 F.2d 519.

On the other hand, we reject the finding that the letter from the Authority to the employees was violative of § 8(a) (1). It did not exceed the bounds and was no more than an economic prophesy made by one financially interested in Respondent.

■ The agency connection between Respondent and the Authority was established by the fact that Mr. Stephenson supplied the Authority with a list of his employees and took no action to avoid the violative conduct of the directors of the Authority. It was thus proper to hold Respondent employer for their conduct and to hold the Authority for the conduct of its directors in making the threats of plant closing to the employees. Cf. Amalgamated Clothing Workers of America v. NLRB, 1966, 125 U.S.App.D.C. 275, 371 F.2d 740; Colson Corporation v. NLRB, 8 Cir., 1965, 347 F.2d 128.

■ We conclude that the editorial against the union which appeared in the local newspaper and the news story regarding the fact that Respondent had cancelled its plans to expand cannot be used as a basis for finding a violation of § 8(a) (1). There was no proof of any connection between Respondent and the newspaper and it would be a dangerous concept for the Labor Board to carve out such an exception to freedom of press rights.

■ Respondent is also charged with violative conduct in taking the somewhat stereotype affidavits of forty two employees after the election and prior to the hearing as a part of its defense to anticipated charges of unfair labor practices. The finding that this activity was coercive of the employees in their right to organize is amply justified by the circumstances shown in the record. See NLRB v. Lindsay Newspapers, Inc., 5

Cir., 1963, 315 F.2d 709; Texas Industries, Inc. v. NLRB, supra.

In sum, the order will be enforced as it respects the § 8(a)(1) violations but no consideration is given to the letter written to the employees by the Authority or to the newspaper editorial and news article.

## II.

██ The conclusion that § 8(a)(5) was violated involves errors of fact and law. We begin by recognizing that the remedy of requiring recognition of a union having a majority is proper where warranted by the facts although, meanwhile, the union may have lost the election. It is particularly apt where the employer has frustrated a union majority by illegal conduct during time gained through the stratagem of seeking an election. See NLRB v. Southeastern Rubber Mfg. Co., 5 Cir., 1954, 213 F.2d 11; Amalgamated Clothing Workers of America v. NLRB, supra; Colson Corporation v. NLRB, supra.

█ Each case must, however, turn on its own facts and circumstances and there are two rules of law to be considered in approaching the issue before us. First, the burden of proof is on the General Counsel, once representation cards are challenged as here because of misrepresentation in their procurement and proof is offered which substantiates the challenge, to show that the subjective intent to authorize union representation was not vitiated by the misrepresentation. Engineers & Fabricators, Inc. v. NLRB, 5 Cir., 1967, 376 F.2d 482. The other rule with which we are concerned is that which the Board follows in such situations of not looking beyond the face of the union authorization card to examine the signers intent except where the union solicitor has stated to the employee that the *only* or *sole* purpose of executing the card is to obtain an election. Cumberland Shoe Corporation, 1963, 144 NLRB 1268, enforced, NLRB v. Cumberland Shoe Corporation, 6 Cir., 1965, 351 F.2d 917. See also NLRB v. Winn-Dixie Stores, Inc., 6 Cir., 1965, 341 F.2d 750; NLRB v. Swan Super Cleaners, Inc., 6 Cir., 1967, 384 F.2d 609.

The *Cumberland Shoe* rule has been criticized [3] and this court has declined to follow it. Engineers & Fabricators, Inc. v. NLRB, supra. We had previously considered the question in the context of an ambiguous authorization card and ruled against the union. NLRB v. Peterson Brothers, Inc., 5 Cir., 1965, 342 F.2d 221. Here there is no ambiguity. As in the *Engineers & Fabricators* case, supra, the employees accepted membership.[4] There is no mention of an election on the cards.

The evidence before the Trial Examiner here was the testimony of the union solicitors and a number of the employees who were solicited. Although some of

3. Among other comments, see Union Authorization Cards, 75 Yale L.J. 805 (1966); Refusal-to-Recognize Charges under Section 8(a)(5) of the NLRB; Card Checks and Employees Choice, 33 U.Chi.L.Rev. 387 (1966); Lesnick, Establishment of Bargaining Rights without an NLRB Election, 65 Mich.L.Rev. 851 (1967).

4. The card here is as follows:

FRONT

...................., 196..
(Date of Signing)

I, .................., now employed by

........................................
(Name of Company employed, by, and location such as the Street—City & State)

SUBSCRIBE TO THE PROVISIONS PRINTED ON THE REVERSE SIDE OF THIS CARD

Miss
Mrs.
................ Mr. ...............
(Operation &                    (Sign here,
Dept.)                          do not print
Social Security No. ..................
............................
(Print here signer's home address)
REVERSE SIDE

have voluntarily accepted membership in Local Union

of the AMALGAMATED CLOTHING WORKERS OF AMERICA (AFL–CIO), and designate said Union as my bargaining agency in all matters pertaining to wages, hours and other conditions of em-

these employees testified that a representation was made to them that the cards would be used only for the purposes of securing an election, the credibility choices of the Examiner to the contrary cannot be set aside. The Examiner keyed on the word "only" pursuant to the *Cumberland Shoe* rule. He disposed of the testimony of these employee witnesses by first saying that their testimony of the use by the union solicitors of the word "only" was brought out by leading questions. The Examiner said that he would credit only what these witnesses had testified to in their own words.

They testified "in their own words" on direct and cross-examination, and sometimes in response to questions from the Trial Examiner, that they were told the cards were being signed so that the employees could have an election to determine whether they wished union representation. No solicitor disputed this; indeed, the solicitors agreed that this was what the employees were told. No solicitor testified that the employees were told that the union would claim representation on the basis of the cards. Each employee denied reading the back of the card. The solicitors did not dispute this. There is no evidence that a card or a copy of a card was given to any employee. Most of the solicitations took place at the homes of the employees. The testimony of one employee was that she told the solicitor that she was not for the union and that she signed for an election as a favor to the solicitor. This testimony was undisputed. Others testified, without contradiction, that they were told that they could vote for or against the

union as they pleased once the election was held. The fact that the union sought a Board election before giving the employer an opportunity to respond to the demand for recognition supports the idea that the solicitors were actually seeking an election through obtaining the cards and that they did not have non-election representation in mind.

On the other side of the coin, the cards say nothing about an election; only that the employee is accepting membership in and is to be represented by the union. There is no contention that the employees could not read. In the end the Board is left to rely almost alone on this fact. The union solicitor who obtained thirty three of the cards testified that his pitch was that the cards would be used to " * * * petition for an election and that if we won the election that we would be their bargaining representative." He would not swear that he advised any employee of the possibility that the union might seek recognition on the basis of the cards. He told some of the employees that the cards would be turned over to the Board in petitioning for an election but that the company would not be aware of who had signed the cards.

The company's contention is that the cards were obtained from its employees on a misrepresentation of fact. Proof was adduced to substantiate this contention. The question then becomes whether the Board, on the record as a whole, would be warranted in concluding that the General Counsel sustained the burden of proving that the cards were not executed for the limited purpose of

ployment. I hereby authorize my employer (the above named company) to deduct from my wages my dues and initiation fee due to said union. This authority to make such deduction shall be irrevocable for the period of one year or until the termination date of the collective bargaining agreement between my Employer and the Union whichever occurs sooner, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive period of one year each or for

the period of each succeeding collective bargaining agreement between my Employer and the Union whichever shall be shorter, unless written notice is given by me to the Employer and the Union not more than twenty (20) days and not less than (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between my Employer and the Union, whichever occurs sooner. If a new worker: this authorization becomes effective at the end of my trial period.

an election. This is the teaching of the *Engineers & Fabricators* case, supra.

It is clear to us that the burden of proof was not sustained at least as to seven employees and one former employee. As stated, one employee, Graham, testified without contradiction that she advised the solicitor that she was not for the union. She executed the card for an election only and simply as a favor to the solicitor so that an election might be held. The testimony of six other employees, Crews, Arnold, Bloodsworth, Thompson, Glover and Audrey Griffis was that they executed the cards for an election only and on the representation that they could vote for or against the union at the election. The same representation was made to Lyons, an employee when solicited but no longer an employee at the time of the hearing. These representations were not denied by the solicitors and their clear import is that they were false in light of the turn of events whereby the union is claiming recognition without an election. Our view is that they were conditions which attached to the fact of the card executions. The language printed on the reverse side of the cards, which the employees did not read and no copy of which was left with them, must give way to the agreement negotiated in each case between the solicitor and the employee.

■ Because the record will not support a finding that the General Counsel overcame the testimony of these employees that they executed the cards on a misrepresentation of fact, it follows that these employees must be eliminated from the total of 37. Thus the union did not have a majority on May 19, 1964, the crucial date.

What we hold is in accord with our *Engineers & Fabricators* case, supra. What we hold also accords with recent cases in other circuits which involve similar facts and the issue of misrepresentation. Cf. NLRB v. S. E. Nichols Company, 2 Cir., 1967, 380 F.2d 438; Crawford Manufacturing Company v. NLRB, 4 Cir., 1967, 386 F.2d 367. Our holding, in point of fact, does not seem to differ from the result reached by the Sixth Circuit Court of Appeals in the recent case of NLRB v. Swan Super Cleaners, Inc., supra.

■ The facts of this case would seem to point to fault in the *Cumberland Shoe* rule. While it does simplify the problem of proof and receives credence from parol evidence rule concepts, there are countervailing policy considerations. The rights involved are those of the employees. The right is to join or not to join a union. The right is to be exercised free from any coercion from any quarter. This can be insured by the use of the secret ballot and by the laboratory conditions which the Board so wisely requires. See General Shoe Corporation, 77 NLRB 124, 127 (1948). Cf. NLRB v. S. S. Logan Packing Company, 4 Cir., 1967, 386 F.2d 562, on the question of reliability of authorization cards. The right of employees to a choice and a choice through the secret ballot should not be lightly disregarded. A rule of convenience such as that formulated in *Cumberland Shoe* must give way to truth based on the record considered as a whole. Anything less disparages the rights accorded employees under § 7 of the Act and may visit the sins of the employer on the employees. The struggle is between the employer and the union but the right to select is that of the employees.

Having held that the union did not have a majority on the crucial date, it is unnecessary to reach the question whether the company refused to bargain in the good faith belief that the union did not have a majority.

Enforcement granted in part; denied in part.