**HYSTER COMPANY, Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

No. 72-2926.

United States Court of Appeals, Fifth Circuit.

June 27, 1973.

Verne W. Newcomb, James B. Ruyle, Portland, Or., for petitioner-cross-respondent.

Walter C. Phillips, Regional Director, N.L.R.B., Atlanta, Ga., Elliott Moore, Acting Asst. Gen. Counsel, N.L.R.B., Washington, D.C., for respondent-cross petitioner.

Before WISDOM, GEWIN and COLEMAN, Circuit Judges.

WISDOM, Circuit Judge:

The Hyster Company, a manufacturer of lift trucks and material handling equipment, seeks review of a finding by the National Labor Relations Board that the company was guilty of violations of § 8(a)(1) and § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) at its plant in the little town of Sulligent, Alabama. The Board concluded, first, that James Maddox, a prominent local citizen, acted as an agent of the company and that his statements to company employees were attributable to the company; second, that Willis Stanford was discharged because of union activity; and third, that the company's personnel manager, Billy

Paul, threatened employees with reprisals if they assisted with union activity. Chairman Miller dissented from the Board's findings that Maddox was an agent of the company and that Stanford was illegally discharged. We affirm the Board's conclusion that Billy Paul violated § 8(a)(1) by his statements to employees but we reverse the other findings because of a lack of substantial evidence.

## I.

In 1969 the company, while investigating potential sites for new construction, met with members of the Town Council and the Industrial Development Board of Sulligent, Alabama. James Maddox had been the chairman of the Industrial Development Board from 1961 to 1964 and was then the chairman of the Town Council. Sulligent (population: 1762) was eager to attract new enterprise. Over several months company representatives and community leaders discussed many subjects, including housing, transportation, and schools, but the subject of unionization arose only once in a brief question as to whether there were any unionized plants in the county. There were none. After several meetings the Sulligent Industrial Development Board agreed to purchase land, erect a building, provide some equipment, and lease the facilities to the company on a nonprofit basis. The capital for this investment by the Board was financed by a public bond issue.

In a sense, Maddox continued his relationship with the company because as a prominent citizen he was frequently listed as a character reference by job applicants. When so listed Billy Paul, the personnel manager and a personal friend, would telephone him to discuss the applicant. On several occasions Maddox suggested to several people that they apply to the company for employment. Maddox made statements to several employees that he did not want a union at the company, that he had employees looking out for a union, that the company would leave if unionized, and that employees would be fired if they supported unionization. Whether in fact the personnel manager had directed several employees and job applicants, including Willis Stanford, to speak with Maddox before being hired or when suggestions of unionization arose, was disputed.

Willis Stanford was hired in June 1971. In mid-July Stanford and two other employees signed union authorization cards. Approximately two weeks later, after Billy Paul and Maddox had spent a vacation together, Stanford was discharged. The company explained that it had fired him because of his unsatisfactory performance, disorganization in his job area, and a decision that it was overstaffed. Other union adherents were not discharged.

Though his first supervisor recommended Stanford for a merit increase because of a helpful suggestion that increased efficiency, that same supervisor later noted that Stanford's performance had begun to deteriorate. Stanford's next supervisor felt from the outset that Stanford's work was deficient. These dissatisfactions were made known to Stanford and the supervisor filed a "negative" report in the personnel folder. Later, the supervisor filed a second negative report after finding Stanford idle. He was again told of the supervisor's complaints but he was not shown the written reports themselves. Finally, the company's Director of Management Action, Ned Snow, noticed Stanford standing idle again. Snow had previously told the plant manager that the plant was overstaffed, that there was a lack of work for the men to do, and the materials handling system, of which Stanford was a part, was improperly organized. Snow had previously ordered the plant manager to cancel plans to hire additional prospective employees.

The day after Snow discovered Stanford unoccupied, August 18, Snow met with the personnel manager, the plant manager, and Stanford's foreman. It was decided to terminate his employment for idleness, inefficiency, and excessive socializing with other employees.

Before Stanford's dismissal, three employees had signed union authorization cards: Stanford, Carruth, and Smith. Carruth testified that Paul asked him if the union organizer was around and warned Carruth to "watch his step." Smith testified that Paul told him not to sign an authorization card and to notify Paul immediately if union organizers approached Smith. Stanford testified that Paul asked him if he had been a union member at his previous place of employment and that Paul told Stanford that the company did not want a union. The Board concluded that these statements by Paul constituted unlawful solicitation and interrogation of employees.

## II.

■■ Accepting as true the anti-union statements attributed to Maddox, we find there is not substantial evidence that Maddox acted as an agent for the company. Maddox was not an employee of the company, he did not have any ownership interest in the company, and he was not compensated by the company. *Cf.* NLRB v. Mississippi Products, 5 Cir. 1964, 213 F.2d 670; NLRB v. Birmingham Publishing Co., 5 Cir. 1958, 262 F.2d 2. As past Chairman of the Industrial Development Board and as Chairman of the Town Council he appreciated the salutary effects of attracting new investment to a town of approximately 1700. His interest and effort in persuading businesses to settle in Sulligent was not unique. The leaders of small communities have identical goals and are willing to offer financially attractive arrangements. The legal relationship of lessor-lessee between the Development Board and the company did not of itself create an agency relationship with Maddox. Cf. NLRB v. Lake Butler Apparel Co., 5 Cir. 1968, 392 F.2d 76, where the county development authority was given a list of employees by the company to assist in mailing a statement to employees that expansion plans had been cancelled due to union activities.

■ Maddox was involved in the hiring of some of the company's employees but that was a natural function of a prominent local citizen and would not in itself establish agency. This the Board admitted in oral argument. The parties disputed whether Billy Paul had directed two employees to interview with Maddox before applying for work. We concur with the dissenting opinion of Chairman Miller that the record shows that Smith had gone to see Maddox on his own initiative and that "Carruth's testimony in this point is so confused as to be almost unintelligible." After Stanford had been hired he talked with Maddox on August 1 at which time Maddox asked Stanford if he had signed a union authorization card. When Stanford replied that he had, Maddox stated that he would "hate to have any trouble up there . . . I'm looking forward to the day they are working five or six hundred people. . . ." Maddox did not purport to be speaking for the company.

There was no definite evidence that Maddox was overtly clothed with apparent authority to act for the company, or that the company knew of the content of his conversations with employees, such as to place a duty of disavowal on the company. These facts are in contrast to cases involving clear evidence of extensive co-operative activities of a company with local business leaders to intimidate organizational efforts. *See* Lake Butler, 392 F.2d at 79; Colson Corp. v. NLRB, 8 Cir. 1965, 347 F.2d 128; Amalgamated Clothing Workers (Hamburg Shirt Co.) v. NLRB, 1966, 125 U.S.App.D.C. 275, 371 F.2d 740; Henry I. Seigel Co. v. NLRB, 6 Cir. 1969, 417 F.2d 1206. There is no significant evidence that the company conducted itself such as to support "the employees reasonable and predictable conclusion that the business leaders in inveighing against the Union were serving in effect as organs of communication from management." Hamburg Shirt, 371 F.2d at 744. Nor was this similar to the imputation of acts of employees to the company. NLRB v.

Mississippi Products, Inc., 5 Cir. 1954, 213 F.2d 670. The facts show only that job applicants realized the advantage of a recommendation from a community leader and that Maddox was such a leader whose evaluations were respected by the company. We conclude that there was a lack of substantial evidence that Maddox was an agent for the company.

### III.

We further conclude that there is not substantial evidence to support a finding that Stanford was discharged because of his union activities. Because Maddox was not an agent of the company and because there is no evidence that the company was informed of the content of Maddox's conversation with Stanford, knowledge of the Stanford-Maddox conversation cannot be imputed to the company. Moreover, even if it were imputable, Stanford revealed only that he had signed an authorization card. The trial examiner placed great emphasis on the joint Maddox-Paul vacation, but that standing alone does not allow an inference of knowledge of the conversation to Paul.

We concur with the reasons stated in the dissent by Chairman Miller that there was sufficient proof that Stanford had been warned during his probationary period of the company's dissatisfaction with his work; that no other union supporter suffered any kind of discrimination; and that there was "no proof of animus toward Stanford because of his limited union activities." *See*, NLRB v. Mid State Sportswear, Inc., 5 Cir. 1969, 412 F.2d 537;[1] NLRB v. Fox Mfg. Co., 5 Cir. 1956, 238 F.2d 211. "The primary function of this Court in reviewing Board decisions is a determination of whether the Board has exercised a 'reasonable' discretion in light of the

circumstances of the individual case." NLRB v. Standard Forge & Axle Co., 5 Cir. 1969, 420 F.2d 508. In view of all of the facts relating to Stanford's dismissal we hold that there is not substantial evidence that he was discharged because of union activity. Stanford is not entitled to reinstatement or back pay.

### IV.

Finally, we hold that there is substantial evidence in the record as a whole to support the Board's conclusion that Billy Paul, the personnel manager, violated § 8(a)(1) by his interrogation, solicitation of surveillance, and intimations of reprisal to several employees.

Enforcement granted in part; denied in part.

---

1. In *Mid State Sportswear*, compare the court's conclusion that the discharge of Keeton was justified because of improper work, with the court's conclusion that the discharge of Dunavent was illegal where her work was "excellent until the date of her suspension". The company failed to give her advance warnings, failed to explain to her the reasons for her discharge at the time of her suspension, and later vacillated as to those reasons. Cf. NLRB v. Georgia Rug Mill, 5 Cir. 1962, 308 F.2d 89, 91, where the employer's reasons for discharge shifted several times.