**CAGLE'S, INC., Petitioner Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent Cross-Petitioner.**

No. 78–1647.

United States Court of Appeals, Fifth Circuit.

Jan. 29, 1979.

944

Swift, Currie, McGhee & Hiers, Victor A. Cavanaugh, Atlanta, Ga., for petitioner cross-respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, John S. Irving, Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, John G. Elligers, Andrew F. Tranovich, Attys., N.L.R.B., Washington, D. C., for respondent cross-petitioner.

Curtis L. Mack, Director Region 10, N.L.R.B., Atlanta, Ga., for other interested party.

Before GOLDBERG, SIMPSON and CLARK, Circuit Judges.

CHARLES CLARK, Circuit Judge:

This petition for enforcement and cross-appeal for review of National Labor Relations Board orders raises several questions regarding contract-bargaining conduct. The NLRB found that Cagle's, Inc., a corporation engaged in the processing and sale of poultry products, had committed violations of 8(a)(1), (3) and (5) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(a)(1), (3), and (5), in its dealings with a union certified to represent employees at its Camilla, Georgia, plant.[1] Specifically, the Board found that Cagle's at-the-table negotiations, when viewed against the background of what it found to be direct dealings, unlawful solicitations, and promises of benefits away from the bargaining table, amounted to bad-faith bargaining in violation of 8(a)(5) and (1). It further concluded that these violations triggered an unfair labor practice strike rendering Cagle's discharge and failure to reinstate striking employees a violation of 8(a)(3). Finally, the Board charged Cagle's with violating 8(a)(5) and (1) by unlawfully withdrawing recognition from the union and by unilaterally granting the employees a wage increase.[2] Because the Board's findings are supported by substantial evidence on the record as a whole, Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we grant enforcement and deny review.

Cagle's and the union held twelve bargaining sessions between the union's certification on October 28, 1975, and the strike on June 9, 1976. During that period the negotiators reached agreement on all issues except arbitration and wages. Cagle's had previously contracted separately with the same union at the company's other plants in Macon and Pine Mountain. Although the wage provisions in those contracts were substantially identical, the arbitration provisions differed. Both included broad no-strike and arbitration clauses, but the Macon contract excluded employee discharges from arbitration. In the Camilla negotiations, Cagle's first proposed a broad no-strike clause but a limited grievance procedure under which the decisions of the general manager of the plant would be final. The union wanted final and binding arbitration. As an alternative to arbitration Cagle's then proposed a grievance panel composed of four employees, two chosen by the grievant and two by the general manager, with the general manager reserving tie-breaking authority. The union countered with the arbitration provisions contained in the Pine Mountain contract. The company finally agreed to arbitration but excluded those disputes involving discharge or disciplinary action leading to discharge. The union refused to accept the limitation. Both parties remained adamant through the June 3 session, the last meeting prior to the employees' strike.

The wage issue negotiations followed a similar course of frustration. On September 2, 1975, prior to union certification, Cagle's, which admits it had a company policy of wage equalization at all three plants, had increased the wages of the Camilla employees 23 cents an hour to an hourly wage of $2.53. At that time Cagle's was paying its Pine Mountain employees $2.54

---

1. The union involved is the Southeast Council, Retail, Wholesale and Department Store Union, AFL–CIO.

2. The Board's decision and order is reported in 234 N.L.R.B. 170 (1978).

an hour and its Macon employees $2.61 an hour. Wages at the latter two plants were scheduled to increase to $2.79 and $2.74 an hour, respectively, in October 1976. Cagle's first wage proposal for the Camilla contract offered no wage increase for the first year, a 6-cent-an-hour increase the second year, and a 7-cent-an-hour increase the third year. In response to the union's request for a 50-cent-an-hour increase for each of the first two years, the company modified the three-year plan to zero-, 8-, and 10-cent increases. Cagle's withdrew this offer in March.

On April 8, after the company made clear its intentions to stand firm on the issues of arbitration and wages, the union met to discuss the progress of negotiations. Willie Marcus, the chairman of the employees' negotiating committee, told the meeting that although they had been negotiating for a long time, "the company don't seem to want to come across on . . . arbitration or wages." He then said that the negotiations were "at the point when we had to make a decision as to whether we wanted to go on strike or not." Following additional discussion, the employees voted to strike and authorized their negotiating committee to set the strike date. Cagle's still did not change its wage or arbitration position through the June 3 meeting.

Several matters which occurred away from the bargaining table during the period of negotiations also contributed to the rift between Cagle's and the union. In March, Lonnie Freeman, a supervisor at Cagle's, asked Charlie Frazier, an employee in his department and close friend, how the union was getting along. Again in April, Freeman asked Frazier how the negotiations were progressing and whether he was going on strike. Frazier replied that since he was not on the negotiating committee he did not know how the negotiations were progressing and could not determine the likelihood of a strike.

During the latter part of April, Jimmy Osteen, the Executive Director of the Camilla Chamber of Commerce and Industrial Developer for the City of Camilla, discussed with Charles Addison, the general manager of the Camilla plant, his intention to write a letter to all industrial and city employees of Camilla. The letter was to encourage employees to "hear both sides of the story" before voting for a union. Apparently Addison never authorized its distribution, but neither did he mention the company's no-distribution rule or otherwise forbid Osteen from acting. On May 9, Osteen placed such a letter, with his name and telephone number, on or in a number of employees' cars in Cagle's parking lot. Addison noticed some of the leaflets stuck under windshield wipers and removed about half of the total distributed but never disavowed Osteen's conduct on behalf of the company.

A few days later, Willie Marcus called Osteen at the telephone number on the letter. According to Marcus' uncontradicted testimony, Osteen told him that a union was not good for their area and invited Marcus to visit Osteen's office to discuss it further. Marcus did meet with Osteen on June 3 after receiving a call from Osteen and a note from Addison to call Osteen. During the meeting Osteen expressed his strong dislike for the union. He told Marcus that the union was neither good for the community nor for business and that "if given the chance, he would bring the union closer with the plant." Marcus testified that Osteen suggested he form a union within the plant and go directly to Addison, whose door would be open at all times. According to Marcus, Osteen offered to mediate by approaching Addison with a wage proposal if the employees formed their own union within the plant. Marcus agreed to think about it and to discuss it with the negotiating committee. Thereafter Osteen did make a wage proposal to Addison, who replied he had no authority to make wage offers.

Another union committee member, Lonnie Williams, also initiated a telephone conversation with Osteen. Williams testified that Osteen encouraged him to try to form a union within the company and to work directly with Addison.

On June 8, the day before the strike actually started, Addison went to see Marcus at his work station to "clarify" Marcus' earlier conversation with Osteen. Addison explained his lack of authority to accept Osteen's wage offer but indicated that something could be worked out if they stopped the union. He told Marcus to encourage the workers to contact him, Addison, directly with any problems and to consider forming a union within the plant.

With these activities as a backdrop, after the June 3 negotiating session in which the company refused to change its position on wages or arbitration, the union committee decided to strike the company beginning June 9. The strike endured from June 9 through July 20. On that first day, the striking workers received a letter from Cagle's notifying them to report to work on June 14. The letter informed the strikers that a failure to do so would constitute a discharge and result in permanent replacement. Cagle's did in fact hire replacements. When the striking employees unconditionally offered to return to work on July 20, Cagle's immediately reinstated some strikers and laid off some replacements. The company, however, delayed the reinstatement of at least 38 strikers for periods of between 6 and 41 days.

During the strike, Cagle's withdrew its last economic proposal of June 3. At a post-strike meeting on July 20, the company reduced its three-year wage offer to zero-, 5-, and 6-cent increases. It assigned production losses during the strike as the reason for this less-favorable offer. In subsequent meetings it reinstated its June 3 wage proposal and finally, on October 29, offered zero-, 10-, and 12-cent increases. It continued to insist upon a broad no-strike clause and limited arbitration.

The negotiators did not meet again until January 11, 1977. At that time the company refused to recognize the union because it believed the union no longer represented a majority of the workers. Since the Board election of October 1975, the company had hired 69 new employees and the bargaining unit had increased from 159 to 170 people.

After walking out of the meeting, the company immediately instituted a unilateral wage increase of 37 cents per hour to take effect January 17, 1977. Since the original hearing before the Administrative Law Judge, the parties resumed bargaining and have reached an agreement.

## Refusal to Bargain

The Administrative Law Judge found that Cagle's did not violate 8(a)(5) of the Act by its manner of bargaining with the union. He found rational support for Cagle's at-the-table bargaining posture and determined that Addison's conduct was the only activity away from the bargaining table which amounted to direct bargaining in violation of 8(a)(1). This violation alone, he concluded, did not demonstrate bad-faith bargaining by Cagle's. The Board, however, found that Cagle's was also responsible for Osteen's direct bargaining with employees, his promising of benefits to induce employees not to support the union, and his soliciting employees to form an independent union.

Osteen has no official agency relationship with Cagle's. Yet the United States Supreme Court has determined that strict rules of agency do not confine employer responsibility in this area. *International Association of Machinists v. N. L. R. B.*, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940); *H. R. Heinz Co. v. N. L. R. B.*, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309 (1940). The underlying principle is preventing the infection of the employees' free participation in the collective bargaining process through their union by an employer's dominance or influence.

■ This court has previously refused to impute to a company the anti-union activities of a "town father" not on the company's payroll. In *Hyster Company v. N. L. R. B.*, 480 F.2d 1081 (5th Cir. 1973), a panel of this court would not place such a burden on the company where "[t]here was no definite evidence that [the chairman of the Town Council] was overtly clothed with apparent authority to act for the company, or that the company knew of the content of

his conversations with employees, such as to place a duty of disavowal on the company." 480 F.2d at 1083. By contrast, where employees may reasonably conclude that " 'the business leaders in inveighing against the Union were serving in effect as organs of communication from management,' " the Board may hold the company accountable for lack of disavowal of the anti-union campaign. *N. L. R. B. v. Lake Butler Apparel Company*, 392 F.2d 76 (5th Cir. 1968); *Amalgamated Clothing Workers of America v. N. L. R. B.*, 125 U.S.App.D.C. 275, 371 F.2d 740, 744 (1966).

■ The record fully supports the Board's finding that Osteen represented corporate policy in the eyes of union members. Substantial evidence demonstrated a connection between Osteen and Addison. This includes Osteen's conversation with Addison before distribution of the anti-union letter and Addison's urging that Marcus contact Osteen. Addison's apparent sanction and encouragement of Osteen's interference burdened the company with responsibility to disavow its approval. *Amalgamated Clothing Workers of America v. N. L. R. B.*, supra, 371 F.2d 740. Cagle's argues that Addison's conversation with Marcus on June 8 amounted to a disavowal of Osteen's statements to Marcus. The testimony is conflicting on this point. Substantial evidence in the record supports the Board's credibility determination that Addison neither disavowed any of Osteen's statements to Marcus or Williams nor any of Osteen's actions regarding the union. *See N. L. R. B. v. Monroe Auto Equipment Co.*, 392 F.2d 559 (5th Cir.), *cert. denied*, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968). On these findings Cagle's is bound by Osteen's actions on its behalf.

■ Osteen's activities so closely paralleled those of Addison that we consider the Board's determination of both 8(a)(1) violations jointly. An employer commits an unfair labor practice under section 8(a)(1) of the Act by acting in a manner to "interfere with, restrain, or coerce employees in the exercise" of their rights to form, join or assist a labor union. A company which induces its employees to withdraw from the union, solicits them to form their own union, and promises to bargain with and grant them wage increases if they "stopped" the union, violates section 8(a)(1) of the Act. *Medo Photo Supply Corp. v. N. L. R. B.*, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); *N. L. R. B. v. A. W. Thompson, Inc.*, 449 F.2d 1333 (5th Cir., 1971), *cert. denied*, 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795 (1972); *Sweeney & Co. v. N. L. R. B.*, 437 F.2d 1127 (5th Cir. 1971). Osteen and Addison's repeated efforts to deal directly with union members outside of the normal channels of the bargaining process are well-supported in the record. This undermining of bargaining-table negotiations is a clear example of employer misconduct contrary to the Act.

■ Again disagreeing with the Administrative Law Judge, the Board concluded that Cagle's at-the-table negotiations, when viewed against the background of direct dealings and unlawful solicitation and promises of benefits away from the bargaining table, amounted to bad-faith bargaining in violation of section 8(a)(5). The Board found that Addison's direct dealings and his solicitation of employees to form an independent union, considered in conjunction with the similar unlawful conduct of Osteen implicitly sanctioned by Addison, undermined the fundamental concept of meaningful collective bargaining.[3] We

---

**3.** The Board further charged Cagle's with an 8(a)(1) violation for Supervisor Freeman's interrogation of employee Frazier. Although the Administrative Law Judge excused the questions as non-coercive conversation between friends, the Board disagreed. It found instead that the coercive atmosphere created, in the total context of the company's other unlawful conduct, rendered the interrogation unlawful. Circumstances surrounding employer interrogation of an employee's union sympathies are determinative of the questions' tendency to coerce. *N. L. R. B. v. Huntsville Manufacturing Co.*, 514 F.2d 723 (5th Cir. 1975); *N. L. R. B. v. Varo, Inc.*, 425 F.2d 293 (5th Cir. 1970). Actual coercion is not necessary; the true test is whether the questioning tends to be coercive. *N. L. R. B. v. Pope Maintenance Corp.*, 573 F.2d 898 (5th Cir. 1978); *N. L. R. B. v. American Manufacturing Co.*, 132 F.2d 740 (5th Cir.

need not determine whether Cagle's bargaining position on wages and arbitration itself constituted "surface bargaining" insufficient to amount to the good-faith bargaining required by section 8(a)(5). *See e. g., Sweeney & Co. v. N. L. R. B., supra,* 437 F.2d 1127; *N. L. R. B. v. Herman Sausage Co.,* 275 F.2d 229 (5th Cir. 1960); *N. L. R. B. v. Whittier Mills Co.,* 111 F.2d 474 (5th Cir. 1940). The finding that solicitation of employees was an effort to circumvent the union and engage in impermissible direct negotiations with the employees has substantial support in the record. The solicitations of Addison or Osteen, although each by itself a violation of section 8(a)(1), do not individually demonstrate that Cagle's bargaining was carried on in bad faith. *National Spinning Co. v. N. L. R. B.,* 419 F.2d 391 (4th Cir. 1969). In the context of Cagle's bargaining attitude, however, these activities seeking to undermine the union by direct dealing with employees on wages or other conditions of employment accompanied by express or implied promises of benefit for withdrawal from the union are together substantial evidence of bad-faith bargaining. *N. L. R. B. v. J. H. Bonck Co.,* 424 F.2d 634 (5th Cir. 1970).

█ In reaching this conclusion we partially rely upon Cagle's later denouncement of the union and institution of unilateral wage increases. If the company's prestrike attitude is ambiguous from the record, its blatant refusal to deal in January 1977 provides substantial evidence that justifies the Board's evaluation of Cagle's persistent efforts to wear down union support. Cagle's does not challenge the finding that its withdrawal of union recognition and wage increases violated section 8(a)(5). Although at the time it expressed a good-faith doubt of the union's majority status, the Administrative Law Judge found otherwise. The company refused to equalize wages un-

til it thought it had finally defeated the union, then immediately unilaterally announced an increase many times greater than any negotiation offer. Taking this conduct together with Osteen's connection to Addison and their joint relationships to Marcus, we find the Board's conclusion supported in the record as a whole.

### The Strike

█ With the preceding discussion as background, we must evaluate the Board's determination that the employee strike which began June 9, 1976, was precipitated by Cagle's unfair labor practices. If we agree that the work stoppage was an unfair labor practice strike, Cagle's subsequent letter to the strikers and failure to immediately reinstate them constitute violations of the Act. Whereas an employer can permanently replace economic strikers, *N. L. R. B. v. Transport Company of Texas,* 438 F.2d 258 (5th Cir. 1971), it must reinstate unfair labor practice strikers immediately upon their unconditional offer to return to work. *N. L. R. B. v. Pope Maintenance,* 573 F.2d 898 (5th Cir. 1978); *N. L. R. B. v. Dell,* 283 F.2d 733 (5th Cir. 1960); *N. L. R. B. v. Birmingham Publishing Co.,* 262 F.2d 2 (5th Cir. 1959). Delayed reinstatement of strikers justified in their refusal to work constitutes a violation of section 8(a)(3) and entitles the injured employees to make-whole relief such as the back pay awarded in this case. Similarly, threatening unfair labor practice strikers with loss of their employee status and reinstatement rights interferes with legitimate union activity and violates section 8(a)(1). *N. L. R. B. v. Sumter Plywood Corp.,* 565 F.2d 379 (5th Cir. 1978); *N. L. R. B. v. Concrete Haulers, Inc.,* 212 F.2d 477 (5th Cir. 1965).

The Board's conclusion rests upon the following reasoning:

1943). Although the campaign of Addison and Osteen had not yet surfaced, the company's lengthy resistance at the bargaining table furnishes substantial evidence supporting the Board's determination that the questioning occurred in a coercive atmosphere. Unlike the conduct of Addison and Osteen, however, this

violation lacks sufficient independent value to contribute to a finding of bad-faith bargaining. It would be circular to reason that the bargaining could support the finding of an unlawful interrogation and that the interrogation supported a finding of bad faith bargaining.

Having determined that the conduct of Addison and Osteen constituted bad-faith bargaining on behalf of [Cagle's], it follows, in these circumstances, that the strike which began on June 9 was an unfair labor practice strike. While the employees at an April 8 meeting voted in favor of striking at a date to be set by the negotiating committee, the committee's decision to strike [Cagle's] was not made until June 9 [sic]. Osteen's unlawful conduct occurred throughout the preceding month and that of Addison took place on June 8, the day before the strike began. We find therefore that the actions of Addison and Osteen which undermine the Union's status as bargaining representative also triggered the strike, making it an unfair labor practice strike.

Cagle's argues that the strike was precipitated by economic motives. There is evidence in the record which supports this position. Willie Marcus himself testified that his speech to the employees immediately preceding the strike vote emphasized his frustration with the company's bargaining position on wages and arbitration. He also admitted to making statements to a newspaper reporter and an unemployment agent during the strike that he was striking for higher wages. But the record further demonstrates that these last two statements were made in the context of other complaints against Cagle's. It is clear, however, that the employee's April 8 vote authorizing the negotiating committee to set a strike date was not influenced by the later activity of Addison and Osteen. Cagle's bargaining stance on wages and arbitration, absent the contextual manifestations of bad-faith bargaining we have found, may not alone be sufficient to justify a union strike. Had the strike occurred on April 8, its character might have been different. However, the negotiating committee, led by Willie Marcus, did not act on its authority until after Osteen's letter was distributed. Its action was taken on June 3, the same day that Osteen and Marcus had a conversation in which Osteen, apparently with Addison's support, discouraged Marcus' union activity. Even then its decision was executory, with the commencement date for the strike set six days later on June 9.

A strike motivated at least in part by a company's unfair labor practices does not lose its quality of being an unfair-labor-practice strike because economic factors influenced the decision. *N. L. R. B. v. Pope Maintenance Corp.*, 573 F.2d 898 (5th Cir. 1978); *N. L. R. B. v. Birmingham Publishing Co., supra,* 262 F.2d 2. There must be evidence of a causal connection between the employer's unlawful activities and the walk-out. *Winter Garden Citrus Products Corp. v. N. L. R. B.,* 238 F.2d 128 (5th Cir. 1956). This connection is sufficiently established if the employer's labor practices aggravated or prolonged the strike. *N. L. R. B. v. Moore Business Forms, Inc.,* 574 F.2d 835 (5th Cir. 1978). Under our limited scope of review, we uphold the Board's finding that the strike was motivated by the unfair labor practices of the company. It therefore follows that Cagle's letter of June 9 threatening discharge and permanent replacement of strikers and the subsequent delay in reinstating employees who struck were further violations of the Act.

*Mootness*

Cagle's does not deny that it violated 8(a)(5) by withdrawing recognition from the union at the January 11 meeting. It asks instead to be exonerated from that charge because it has since reestablished relations and executed a contract with the union. This court has repeatedly refused to deny enforcement on mootness grounds. *N. L. R. B. v. Mangurian's, Inc.,* 566 F.2d 463 (5th Cir. 1978) (valid election does not moot enforcement of prior unfair labor practice charges arising out of an election campaign); *N. L. R. B. v. Southern Household Products Company,* 449 F.2d 749 (5th Cir. 1971) (substantial compliance with Board's order does not moot enforcement to provide incentive for continued compliance through the possible sanction of contempt proceedings for violations); *N. L. R. B. v. American Guild of Variety Artists,* 420 F.2d 311 (5th Cir. 1969) (full compliance with a Board order is no defense to enforcement of order

with preventative as well as remedial function); *N. L. R. B. v. Great Atlantic & Pacific Tea Company*, 407 F.2d 387 (5th Cir. 1969) (the Board is entitled to judicial enforcement of its orders even in cases where the offending parties have already complied with the orders).

These decisions stem from the authority of two United States Supreme Court precedents. In *NLRB v. Mexia Textile Mills*, 339 U.S. 563, 70 S.Ct. 826, 94 L.Ed. 1067 (1950), the company violated sections 8(a)(1) and (5) of the Act by failing to bargain in good faith. Subsequent to the Board's order, but prior to the Board's petition to this circuit for enforcement, the company entered into good-faith bargaining with the union. The parties were unable to reach an agreement. In rejecting the company's mootness argument, the Court said:

> We think it plain from the cases that the employer's compliance with an order of the Board does not render the cause moot, depriving the Board of its opportunity to secure enforcement from an appropriate court. . . . A Board order imposes a continuing obligation; and the Board is entitled to have the resumption of the unfair practice barred by an enforcement decree. As the Court of Appeals for the Second Circuit remarked, "no more is involved than whether what the law already condemned, the court shall forbid; and the fact that its judgment adds to existing sanctions that of punishment for contempt, is not a circumstance to which a court will ordinarily lend a friendly ear." *National Labor Relations Board v. General Motors Corp.*, 1950, 179 F.2d 221, 222. The Act does not require the Board to play hide-and-seek with those guilty of unfair labor practices.

339 U.S. at 567–68, 70 S.Ct. at 828. In *NLRB v. Raytheon Company*, 398 U.S. 25, 90 S.Ct. 1547, 26 L.Ed.2d 21 (1970), the Court similarly refused to moot a Board order to cease and desist certain anti-union activity which had invalidated a union election. The company convinced the United States Court of Appeals for the Ninth Circuit that an intervening election certified by the Board rendered moot all portions of the order under review which related to the representation case. The Supreme Court disagreed. Relying upon the precedent of *Mexia Textile Mills*, the Court reasoned:

> The Act, however, is not designed merely to protect a particular election or organization campaign. It is designed to protect employees in the exercise of their organizational rights, and that protection cannot be affected merely because a particular labor organization has chosen an immediate election rerun rather than to await enforcement of the Board order.

398 U.S. at 27, 90 S.Ct. at 1549.

The Court's rationale for enforcing the order in *Raytheon* was to assure that the specific acts complained of would not be repeated. At the same time, it recognized that "there are situations where an enforcement proceeding will become moot because a party can establish that 'there is no reasonable expectation that the wrong will be repeated.'" 398 U.S. at 28, 90 S.Ct. at 1549. We hold that today's facts make such a case. In paragraphs 2c, d, and e, the Board's order would require Cagle's to resume recognizing the union as the exclusive collective bargaining representative of the appropriate unit, notify the union of this recognition, and bargain with the union for a reasonable period of time. Since the parties have already met and concluded a binding agreement, there is no reasonable expectation that the wrongs addressed in these paragraphs of the bargaining order will be repeated. We therefore refuse enforcement of these provisions of the order.

Except as to paragraphs 2c, d, and e, the order is

ENFORCED.

REVIEW DENIED.